**Slip Op. 03-108**

# UNITED STATES COURT OF INTERNATIONAL TRADE

**Before: Judge Judith M. Barzilay**

_____

| | |
|---|---|
| Slater Steels Corporation, *et al.*, | : |
| Plaintiffs, | : |
| v. | : |
| United States, | : |
| Defendant. | : |
| _____ | : |
| | |
| _____ | |
| Viraj Group, | : |
| Plaintiff, | : |
| v. | : |
| United States, | : |
| Defendant, | : |
| and | |
| | : |
| Slater Steels Corporation, *et al.*, | |
| Defendants-Intervenor. | : |
| _____ | : |

**Consol. Ct. No. 02-00551**

[Plaintiffs and Defendants-Intervenor Slater Steels Corporation *et al.*'s USCIT R. 56.2 Motion for Judgment upon an Agency Record is granted, and the case is remanded to the United States Department of Commerce.]

Decided: August 21, 2003

*Collier Shannon Scott, PLLC,* (*Robin H. Gilbert*), for Plaintiffs and Defendants-Intervenor Slater Steels Corporation, *et al.*

*Peter D. Keisler*, Assistant Attorney General, United States Department of Justice, (*David M. Cohen*), Director, Commercial Litigation Branch, Civil Division, *Patricia M. McCarthy*, Assistant Director, (*Thomas B. Fatouros*), Trial Attorney; *Christine J. Sohar,* Office of the Chief Counsel for Import Administration, United States Department of Commerce, for Defendant.

**OPINION**

**BARZILAY, JUDGE:**

**I. INTRODUCTION**

This is a consolidated case.[1] Plaintiffs and Defendants-Intervenor Slater Steels Corporation, Carpenter Technology Corporation, Electralloy Corporation, and Crucible Specialty Metals Division of Crucible Materials Corporation (hereinafter "domestic industry" or "Plaintiffs") challenge the final results of an administrative review of an antidumping duty order on stainless steel bar from India undertaken by the United States Department of Commerce, International Trade Administration ("Commerce"). *See Stainless Steel Bar from India; Final Results of Antidumping Duty Administrative Review*, 67 Fed. Reg. 45,956 (July 11, 2002) ("*Final Results*"); *Notice of Amended Final Results of Antidumping Duty Administrative Review: Stainless Steel Bar from India*, 67 Fed. Reg. 53,336 (Aug. 15, 2002). The sole issue challenged is Commerce's "collapsing" of the companies of the Viraj Group, an Indian competitor, into a single entity for the purposes of calculating dumping margins, pursuant to 19 C.F.R. § 351.401(f) (2000).[2] The explanations for Commerce's determinations are contained in the accompanying

---

[1] Slater Steels Corporation *et al.* were Plaintiffs in one case and Defendants-Intervenor in another case before this Court that have since been consolidated. *See* Order signed by Court on November 14, 2002. The Viraj Group, Plaintiff in one case, consented to the consolidation of the cases and filed no papers in opposition to this motion of the domestic industry.

[2] "Collapsing" involves treating a group of affiliated producers as a single entity for the calculation of dumping margins. Under the regulations, Commerce will collapse or "treat two or more affiliated producers as a single entity where those producers have production facilities for similar or identical products that would not require substantial retooling of either facility in order to restructure manufacturing priorities" and where "there is a significant potential for the manipulation of price or production." 19 C.F.R. § 351.401(f)(1). The term "affiliated" is defined in 19 U.S.C. § 1677(33) (2000).

unpublished *Issues and Decision Memorandum for the Final Results of the Administrative Review of Stainless Steel Bar from India* (July 5, 2002) ("*Decision Memorandum*") in *App. to Mem. in Supp. of Pls.' Mot. for J. upon an Agency R.* ("*Pls.' App.*") 4. For the reasons outlined below, the domestic industry's USCIT R. 56.2 Motion for Judgment upon an Agency Record is granted, and the case is remanded to Commerce to reconsider its analysis of the collapsing issue and, if necessary, to revise its dumping margin calculations in accordance with this opinion.

## II. BACKGROUND

In February 2001, the Viraj Group petitioned Commerce to conduct an administrative review of the antidumping duty order on certain stainless steel bar ("SSB") from India for the period of review of February 1, 2000 through January 31, 2001 ("POR").[3] In March 2001, Commerce initiated the review. *See Initiation of Antidumping and Countervailing Duty Administrative Reviews and Requests for Revocations in Part*, 66 Fed. Reg. 16,037 (Mar. 22, 2001). On March 7, 2002, Commerce published the preliminary results of the administrative review. *See Stainless Steel Bar from India; Preliminary Results of Antidumping Duty Administrative Review and Partial Rescission of Administrative Review*, 67 Fed. Reg. 10,377 (Mar. 7, 2002) ("*Preliminary Results*"). The dumping margin for the Viraj Group was

---

[3] Notice of the antidumping duty order was published in the *Federal Register* on February 21, 1995. *See* 60 Fed. Reg. 9661. The subject merchandise SSB is "stainless steel in straight lengths that have been either hot-rolled, forged, turned, cold-drawn, cold-rolled or otherwise cold-finished, or ground, having a uniform solid cross section along their whole length" in various geometric shapes. *Final Results* at 45,957. The subject merchandise does not include stainless steel semi-finished products, cut length flat-rolled products, wire, and angles, shapes and sections. *Id.* The statute defines "subject merchandise" as merchandise subject to an antidumping investigation, review or order. 19 U.S.C. § 1677(25).

preliminarily determined to be 0.10 percent. *Id.* at 10,380. On July 5, 2002, Commerce issued the final results of the administrative review, which were published in the *Federal Register* on July 11, 2002. *See Final Results* at 45,958. The final dumping margin for the Viraj Group was determined to be 0.47 percent.[4] *Id.* at 45,957. Thus, the Viraj Group received a *de minimis* dumping margin in both the *Preliminary* and *Final Results*, as a collapsed entity.[5]

The Viraj Group consists of Viraj Alloys, Ltd. ("VAL"), Viraj Forgings, Ltd. ("VFL"), Viraj Impoexpo, Ltd. ("VIL"), and Viraj USA, Inc. ("Viraj USA").[6] In the *Preliminary Results*, Commerce found that the Viraj Group companies had common ownership, shared directors, and intertwined operations – each a factor in the decision to collapse. *Preliminary Results* at 10,378. In particular, Commerce determined that the following production relationships exist between the companies: VAL produces "black bar" (hot-rolled round bar) and billets for sale in the Indian home market. Apart from direct sale in the market, VAL supplies VIL with the black bar which VIL further processes into "bright bar" (cold-finished bar) for sale in the United States. In addition to bright bar, VIL produces stainless steel billets, flanges, forgings and wires. VAL also supplies VFL with billets which VFL processes into stainless steel forged flanges. Basing its

---

[4] Commerce amended the *Final Results* on August 15, 2002 to correct ministerial errors. *See Notice of Amended Final Results of Antidumping Duty Administrative Review: Stainless Steel Bar from India*, 67 Fed. Reg. 53,336 (Aug. 15, 2002). The dumping margin of the Viraj Group remained the same. *Id*. at 53,337.

[5] "[A] weighted average dumping margin is de minimis if [Commerce] determines that it is less than 2 percent ad valorem or the equivalent specific rate for the subject merchandise." 19 U.S.C. § 1673b(b)(3) (2000).

[6] At issue here is the collapsing of VAL, VFL, and VIL. Viraj USA is a company incorporated in the United States and is a 100% subsidiary of VFL. *See Viraj Questionnaire Response* at A-6 to A-7 (June 29, 2001) in *App. to Def.'s Mem. in Opp. to Pls.' Mot. for J. upon an Agency R.* ("*Def.'s App.*") 3.

determination on these findings and retracing the language of 19 C.F.R. § 351.401(f), Commerce

concluded in the *Preliminary Results* that no "substantial retooling would be required for VAL,

VIL, or VFL to restructure their manufacturing priorities" and that these companies should

therefore be collapsed and treated as one entity. *Id.*

In the *Final Results*, Commerce added that the Viraj Group companies also leased

equipment or facilities from one another. In particular, Commerce announced:

> VAL and VIL can produce subject merchandise (*i.e.*, similar or identical products)
> and can continue to do so, *independently or under existing leasing agreements*,
> without substantial retooling of their production facilities. Furthermore, the three
> Viraj Group companies share the same two directors who have significant
> ownership of each company. The two directors oversee all aspects of production,
> pricing and sales. *See Viraj Section A Questionnaire Response* (June 29, 2001) at
> A-6 to A-8. Therefore, we find a significant potential for the manipulation of price
> and production among VIL, VAL and VFL. For these reasons, we find that VIL,
> VAL and VFL meet the regulations' collapsing requirements.

*Decision Memorandum* at 3 (emphasis added). The record further contains the Viraj Group's

information that "VIL pays plant and machinery hire charges to VAL for VAL's production

facilities." *Stainless Steel Bar from India; Rebuttal Brief - Viraj* at 2 (Apr. 15, 2002) ("*Viraj*

*Admin. Br.*") in *Def.'s App.* 1. "In other words, VIL is producing the bright bars sold to the

[United States] using VAL-owned machinery, machinery that VAL itself can use to make the

bright bars made by VIL." *Id.*

As a response to the challenge that it had ignored its precedent on collapsing, Commerce

observed in the *Final Results* that such determinations were "fact specific in nature, and

require[d] a case-by-case analysis." *Decision Memorandum* at 3 (quoting *Antidumping Duties;*

*Countervailing Duties; Final Rule*, 62 Fed. Reg. 27,296, 27,346 (May 19, 1997)).

Reemphasizing that VAL and VIL both had capability to produce subject merchandise,

Commerce factually distinguished two prior Commerce determinations which had refrained from collapsing affiliated producers because they had no or "limited" overlap of respective production capabilities. *Id.* at 3-4 (discussing *Notice of Final Determination of Sales at Less Than Fair Value: Stainless Steel Bar from Germany*, 67 Fed. Reg. 3159 (Jan. 23, 2002) and *Stainless Steel Sheet and Strip from Taiwan; Final Results and Partial Rescission of Antidumping Duty Administrative Review*, 67 Fed. Reg. 6682 (Feb. 13, 2002)). On the other hand, Commerce emphasized that, contrary to its actions in previous administrative reviews, it collapsed the Viraj Group companies in more recent administrative reviews of two other antidumping duty orders (those of stainless steel wire rod and of stainless steel flanges from India). *Id.* at 4; *compare Stainless Steel Wire Rod from India; Final Results of Antidumping Duty Administrative Review*, 65 Fed. Reg. 31,302 (May 17, 2000) (not collapsing the Viraj Group) *with Stainless Steel Wire Rod from India; Final Results of Antidumping Duty Administrative Review*, 67 Fed. Reg. 37,391 (May 29, 2002) (collapsing the Viraj Group) *and Certain Forged Stainless Steel Flanges from India; Preliminary Results and Partial Rescission of Antidumping Duty Administrative Review*, 67 Fed. Reg. 10,358 (Mar. 7, 2002) (preliminarily collapsing the Viraj Group).

## III. DISCUSSION

### A. Parties' arguments.

"Collapsing" involves treating a group of affiliated producers as a single entity for the calculation of dumping margins. In this review, Commerce used the collapsed entity's cost of production to value steel billet, the primary input in the manufacturing of SSBs. The domestic

industry argues that instead of collapsing, Commerce should have used the "major input rule."[7]

*See Mem. in Supp. of Pls.' Mot. for J. upon an Agency R.* ("*Pls.' Br.*") at 5.  Under the major

input rule, Commerce values a major input at the highest of the transfer price between affiliated

entities, the input's market price or its cost of production by the entity that produces the input.

*See* 19 C.F.R. § 351.407(b); 19 U.S.C. § 1677b(f)(3).  The domestic industry charges that

collapsing understates the dumping margin of the Viraj Group companies.

Under the regulations, Commerce will collapse or "treat two or more affiliated producers

as a single entity where those producers have production facilities for similar or identical

products that would not require substantial retooling of *either* facility in order to restructure

manufacturing priorities" and where "there is a significant potential for the manipulation of price

or production."[8]  19 C.F.R. § 351.401(f)(1) (emphasis added).  Emphasizing the word "either" in

the regulation, the domestic industry contends that, contrary to the "substantial retooling" prong

of the regulation, Commerce made no determination as to whether each Viraj Group company

"on its own" could produce the subject merchandise without substantial retooling.  *Pls.' Br.* at 7.

Instead, the domestic industry adds, Commerce merely opined that "VIL and VAL can produce

subject merchandise (*i.e.*, similar or identical products) and continue to do so, independently or

---

[7] Both collapsing and the major input rule involve affiliated producers.  The determination of affiliation is made pursuant to 19 U.S.C. § 1677(33) and requires a degree of common control.  There is no dispute here as to the affiliated status of the Viraj Group companies.

[8] To determine whether there is a significant potential for the manipulation of price or production, Commerce considers common ownership, shared directors or managers, and intertwined operations as factors.  19 C.F.R. § 351.401(f)(2).  Since the court decides in its final analysis that based on the record here the Viraj Group companies do not have "production facilities for similar or identical products that would not require substantial retooling," the court need not reach the price manipulation issue.

under existing leasing agreements, without substantial retooling of their production facilities." *Id.* at 6 (quoting *Decision Memorandum* at 3). The domestic industry points out that VAL, VIL, and VFL each have substantially different production facilities. *See id.* at 7-9. In particular, unlike VIL and VFL, VAL has melting capability and rolling mills, but no "finishing" capability for processes such as annealing and pickling. The domestic industry adds that substantial capital investment would be required to retool each company's production facilities to the extent that each could produce the subject merchandise on its own. *See id.* at 10.

Commerce responds that it properly collapsed the Viraj Group companies because there "is nothing in the regulation that prohibits Commerce from considering a company's use of leased facilities as part of the company's production facilities." *Def.'s Mem. in Opp. to Pls.' Mot. for J. upon an Agency R.* ("*Def.'s Br.*") at 10. Commerce maintains that "[p]ursuant to the domestic industry's analysis, affiliated companies that utilize production facilities not owned by the producer could never be collapsed because they lack components of the production process and, accordingly, would require substantial retooling to restructure manufacturing priorities and produce the subject merchandise." *Id.* at 12-13. Accordingly, Commerce argues, "all production facilities used in production of the subject merchandise must be considered in its collapsing analysis." *Id.* at 13. Since it has been determined that there is "broad overlap of production capability" between the Viraj Group companies, treated separately "the Viraj Group easily could shift production and sell the subject merchandise through the company with the smallest margin." *Id.* (quoting *Decision Memorandum* at 3).

The domestic industry counters that under 19 C.F.R. § 351.401(f)(1) collapsing determinations should "focus on the actual production capabilities of the parties involved, and

thus [Commerce] cannot impute to those parties any production capabilities made available through a leasing arrangement, a tolling operation, or subcontracting operation." *Pls.' Reply Br.* at 3. Otherwise, the domestic industry argues, there would have been no need to include a "substantial retooling" requirement in the regulation as Commerce could always assume that a party could lease the necessary production equipment or facility. The domestic industry articulates that VIL's need to lease equipment from VAL is "*per se* evidence" that VIL (or VAL) is not capable on its own to produce the subject merchandise. *Id.* The domestic industry further remarks that Commerce's assumption that because VIL leased VAL's equipment the two companies "shared" the same equipment is erroneous. On the contrary, the domestic industry asserts, the companies' financial statements show that the equipment was not shared. *See id.* at 5-6.

The domestic industry maintains that individual dumping margins of the Viraj Group might have been higher than that of the collapsed entity. *See id.* at 13-14. The domestic industry explains that, by being collapsed, respondent companies avoid the arm's-length-transactions test of the "transactions disregarded" and "major input rule" provisions of the statute that determine how transactions among affiliates should be evaluated. 19 U.S.C. § 1677b(f)(2) (allowing self-dealing transactions to be disregarded) & (3) (providing for the major input rule). The domestic industry further explains that, where the production capabilities of affiliated producers are complementary, however, respondent companies may benefit from less scrutiny of their internal transactions.[9]

---

[9] Because the court finds, based on the record and as a matter of law, that Commerce erred in the *Final Results* by collapsing the Viraj Group companies, the court need not reach the domestic industry's assertion that Commerce's decision to collapse the Viraj Group in this

**B. Analysis.**

The regulation governing collapsing sets out a three-part test by which Commerce must determine that (1) the companies are affiliated pursuant to 19 U.S.C. § 1677(33), (2) the companies are capable of producing similar or identical products without substantial retooling of each producer's facility, and (3) there is significant potential for the manipulation of price or production. *See* 19 C.F.R. § 351.401(f). Only the second part of this test is implicated here.

The policy rationale behind collapsing is to prevent affiliated exporters with same or similar production capabilities to channel production of subject merchandise through the affiliate with the lowest potential dumping margin and thereby circumvent the United States antidumping law. The regulation mandates Commerce to determine whether affiliated producers that are investigated have "production facilities for similar or identical products" such that they are capable of rearranging their production priorities within the group without "substantial retooling" of their facilities. *Id.* Here, the record shows that VAL produces a semi-finished or intermediate product, steel billet, that is used as an input in the manufacturing of SSBs, the subject

---

review is inconsistent with its prior administrative reviews. In any event, the domestic industry's arguments on this issue fall short because the record in this review shows that the relationship among the Viraj Group companies has changed since the former review of the antidumping duty order on stainless steel wire rod ("SSWR review"), which the domestic industry highlights. *See Stainless Steel Wire Rod from India; Final Results of Antidumping Duty Administrative Review*, 65 Fed. Reg. 31,302 (May 17, 2000), sustained by *Viraj Group, Ltd. v. United States*, 25 CIT, ___, 162 F. Supp. 2d 656 (2001). Moreover, the merchandise implicated in these reviews is different. Commerce's collapsing determinations are "fact-specific in nature, requiring a case-by-case analysis." *Antidumping Duties; Countervailing Duties; Final Rule*, 62 Fed. Reg. 27,296, 27,346 (May 19, 1997). The court further notes that Commerce's collapsing of the Viraj Group in the more recent *Stainless Steel Wire Rod from India; Final Results of Antidumping Duty Administrative Review*, 67 Fed. Reg. 37,391 (May 29, 2002), is currently being challenged in another action before the court. *See Carpenter Technology Corp. v. United States*, Ct. No. 02-00448.

merchandise.  VAL has the melting and rolling capabilities to produce steel billets, but does not

have the finishing capability to produce the subject merchandise.  On the other hand, VIL cannot

produce billets, but has annealing and pickling capabilities to further process billets into SSBs.

"Substantial retooling," including adding induction and refining furnaces, argon oxygen

decarburiser converters, casting machines, and rolling mills, is needed to make VIL's production

facilities equivalent with VAL's.  In addition, VFL does not produce the subject merchandise.[10]

All this information can be deduced from schemata provided by the Viraj Group (and submitted

to Commerce in questionnaire responses), which visually represent the companies' production

facilities and what they are capable of producing.  *See Viraj Questionnaire Response* at 62-64 in

*Pls.' App.* 5.  Accordingly, VAL and VIL (and VFL) do not have "production facilities for

similar or identical products" and cannot produce the subject merchandise on their own without

"substantial retooling" of their facilities.  As they lack equivalent production capabilities, the

Viraj Group companies do not fit into the profile contemplated by the regulation pertaining to

collapsing.  If the individual companies within the group are treated separately, they cannot divert

production of subject merchandise to the lowest-margin affiliate.

Moreover, by collapsing the Viraj Group companies Commerce may have underestimated

their cost of production and consequently the group's dumping margin.[11]  Collapsing does not

_____

[10] The court notes that Commerce claims that "VIL and VFL sold the subject bar in the U.S. market during the POR," citing the Viraj Group's administrative brief at page 2.  *Def.'s Br.* at 14.  There, however, the Viraj Group merely reiterated Commerce's finding in the SSWR review that "VIL/VFL sold hot rolled annealed and pickled *wire rods*."  *Viraj Admin. Br.* at 2 in *Def.'s App.* 1 (emphasis added).

[11] "The term 'dumping margin' means the amount by which the normal value [or home market value] exceeds the [U.S. price] of the subject merchandise."  19 U.S.C. § 1677(35)(A); § 1677a(a).  In the event the normal value is not available, such as when the company does not sell

allow transactions between affiliates to be scrutinized as there is no "transactions disregarded" component to the regulation pertaining to collapsing and the companies are treated as a single entity. In the POR, instead of purchasing steel billet from a third party (or from VAL), VIL entered into a lease agreement to use VAL's production facilities. The lease agreement is not part of the administrative record. The conditions and terms of the lease agreement (as well as other transactions among the Viraj affiliates) are, however, material to ascertain whether such arrangements constitute arm's-length transactions. Were the cost of steel billet artificially low when compared to its true market value, the collapsed entity's dumping margin would be unduly low. This is the type of situation which the "major input rule" attempts to rectify. *See* 19 C.F.R. § 351.407(b) (sanctioning the use of the higher of the affiliated transaction price, the market price or the cost of production of the input in dumping duty calculations); *cf. Viraj Group, Ltd. v. United States*, 162 F. Supp. 2d 656, 671 (2001) (affirming Commerce's decision not to collapse the Viraj Group companies and further observing that, when VIL purchased steel billets from VAL, their relationship was more like "manufacturer and supplier" and therefore the use of the major input rule was more appropriate).

The court is mindful of its mandate to "sustain 'any determination, finding or conclusion found' by Commerce unless it is 'unsupported by substantial evidence on the record, or otherwise not in accordance with law.'" *Fujitsu General Ltd. v. United States*, 88 F.3d 1034, 1038 (Fed. Cir. 1996) (quoting 19 U.S.C. § 1516a(b)(1)(B)). The court must also "give due

---

the product in its home market, normal value may be "constructed" using cost of manufacture, selling general and administrative expenses, and profit. § 1677b(e); 19 C.F.R. § 351.405(a). Therefore, the lower the cost of production for steel billets, the lower is the Viraj Group's dumping margin.

weight to the agency's interpretation of the statute it administers, and . . . accept that interpretation if it is 'sufficiently reasonable.'" *IPSCO, Inc. v. United States*, 899 F.2d 1192, 1194-95 (Fed. Cir. 1990) (quoting *Zenith Radio Corp. v. United States*, 437 U.S. 443, 450 (1978)). "On the other hand, [the court] cannot sustain [Commerce's] exercise of administrative discretion if it contravenes statutory objectives," *id.* at 1195, or its own regulation, *Fort Stewart Schools v. Fed. Labor Relations Auth.*, 495 U.S. 641, 654 (1990) ("It is a familiar rule of administrative law that an agency must abide by its own regulations."). By collapsing affiliates with production structures and relationships similar to those of the Viraj Group companies, Commerce opens the door to potential concealment of dumping.

Moreover, the court finds that Commerce's decision to collapse the Viraj Group companies is unsupported by substantial evidence and that Commerce's explanations for its reasons are inadequate. In the *Final Results*, Commerce merely observed that "VAL and VIL can produce subject merchandise (*i.e.*, similar or identical products) and can continue to do so, independently or under existing leasing agreements, without substantial retooling of their production facilities." *Decision Memorandum* at 3. On the question of production capabilities, the record contains schemata provided by the Viraj Group (and submitted to Commerce) which clearly show that VIL and VAL lack capability to produce similar or identical products. *See Viraj Questionnaire Response* at 62-64 in *Pls.' App.* 5. On the other hand, the record also contains the information provided by the Viraj Group that "VIL is producing the bright bars sold to the [United States] using VAL-owned machinery, machinery that VAL itself can use to make the bright bars made by VIL." *Viraj Admin. Br.* at 2 in *Def.'s App.* 1. That is, the Viraj Group declared that VAL and VIL both could produce subject merchandise. There is no indication in

the record, however, that VAL was leasing or otherwise using VIL's or any other company's finishing equipment and facilities. The Viraj Group's statement is thus not substantiated by the record and further conflicts with diagrams (submitted by the Viraj Group itself) which objectively display the companies' respective production lines. *Cf. Carlisle Tire & Rubber Co. v. United States,* 9 CIT 520, 533, 622 F. Supp. 1071, 1082 (1985) (questioning whether a self-interested statement lacking indicia of reliability can constitute substantial evidence). Moreover, the record contains no evidence that VAL and VIL were sharing equipment and facilities or, as Commerce claims, that "all three companies use[d] the same production facilities." *Def.'s Br.* at 15. On the contrary, the record contains VIL's own declaration that VAL's plant and machinery were under its "exclusive use," and this declaration is supported by the fact that VIL capitalized at cost equipment "acquired and installed" from VAL in its financial statements (pointing to VIL's exclusive control over equipment).[12] *Viraj Questionnaire Response* at 80 in *Pls.' App.* 9; *Notes on Balance Sheet* at 39 in *Pls.' App.* 10.

The court adheres to the standard articulated by the United States Court of Appeals for the Federal Circuit that "[s]ubstantial evidence on the record means 'more than a mere scintilla' and 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion,' taking into account the entire record, including whatever fairly detracts from the substantiality of the evidence." *Atlantic Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed.

---

[12] Consistent with this information, the domestic industry argues that the lease agreement between VIL and VAL constitutes a capital lease, which in accounting terms is equivalent to an "acquisition" of the assets. *See* UNITED STATES FINANCIAL ACCOUNTING STANDARDS BOARD, STATEMENT NO.13 ("Accounting for Leases"), *available at* http://www.fasb.org/pdf/fas13.pdf; *see also* INTERNATIONAL ACCOUNTING STANDARD ("IAS") 17 ("Leases") (summary), *available at* http://www.iasc.org.uk. The lease document is, however, not available to confirm the type of the lease.

Cir. 1984) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477, 488 (1951)). In addition, the agency must indicate to the court a "rational connection" between its findings and decisions so to enable a meaningful review. *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962). Agency transparency is a cornerstone of administrative law. Yet, neither the *Final Results* nor the accompanying *Decision Memorandum* contains any indication of how Commerce reconciled the conflicting schemata and statement and how it arrived at its decision to collapse the Viraj Group companies. In addition, neither document reveals how Commerce's observation in the *Final Results* that the two companies' production facilities "broadly" overlapped logically flows from its findings in the *Preliminary Results* to the effect that production facilities complemented one another. The record contains no evidence showing that production facilities of the companies have undergone any change since the *Preliminary Results*, and Commerce points to none.

## IV. CONCLUSION

For all the foregoing reasons, the domestic industry's USCIT R. 56.2 Motion for Judgment upon an Agency Record is granted, and since the court sees no support on this record for the decision to collapse the Viraj Group companies, the case is remanded to Commerce to reconsider its analysis of the collapsing issue and, if necessary, to revise its dumping margin calculations in accordance with this opinion.

Dated : _____          _____
      New York, New York                Judith M. Barzilay