Slip Op. 04-22

# UNITED STATES COURT OF INTERNATIONAL TRADE

**Before: Judge Judith M. Barzilay**

| | | |
|---|---|---|
| _____ | | |
| Slater Steels Corporation, *et al.*, | : | |
| Plaintiffs, | : | |
| v. | : | |
| United States, | : | |
| Defendant. | : | **Consol. Ct. No. 02-00551** |
| _____ | | |
| _____ | | |
| | : | |
| Viraj Group, | | |
| | : | |
| Plaintiff, | | |
| | : | |
| v. | | |
| | : | |
| United States of America, | | |
| | : | |
| Defendants, | | |
| and | : | |
| | | |
| Slater Steels Corporation, *et al.*, | : | |
| Defendants-Intervenor. | | |
| _____: | | |

[Case remanded to the United States Department of Commerce.]

Decided: March 8, 2004

*Collier Shannon Scott, PLLC,* (*Robin H. Gilbert*), for Plaintiffs and Defendants-Intervenor Slater Steels Corp., *et al.*

*Peter D. Keisler*, Assistant Attorney General, United States Department of Justice, (*David M. Cohen*), Director, Commercial Litigation Branch, Civil Division, *Jeanne E. Davidson*, Deputy Director, (*Thomas B. Fatouros*), Trial Attorney; *Christine J. Sohar,* Office of the Chief Counsel for Import Administration, United States Department of Commerce, for Defendant.

*Miller & Chevalier Chartered*, (*Peter Koenig*), for Plaintiff Viraj Group.

**OPINION AND ORDER**

**BARZILAY, JUDGE:**

## I. INTRODUCTION

The United States Department of Commerce ("Commerce" or "government") timely filed the Final Results of Redetermination Pursuant to Court Remand ("*Remand Results*"), pursuant to the remand order of the court in *Slater Steels Corporation v. United States*, 27 CIT __, 279 F. Supp. 2d 1370 (2003) ("*Slater I*"), the familiarity with which is presumed. The sole issue in this consolidated action (as it was in *Slater I*) is Commerce's "collapsing" of three companies of the Viraj Group, an Indian competitor, pursuant to 19 C.F.R. § 351.401(f) (2000) ("collapsing regulation").

The Viraj Group companies implicated in collapsing are Viraj Alloys, Ltd. ("VAL"), Viraj Impoexpo, Ltd. ("VIL"), and Viraj Forgings, Ltd. ("VFL"). "Collapsing" involves treating a group of affiliated producers as a single entity for the calculation of dumping margins.[1]

Plaintiffs and Defendants-Intervenor Slater Steels Corporation, Carpenter Technology Corporation, Electralloy Corporation, and Crucible Specialty Metals Division of Crucible Materials Corporation (collectively "domestic industry" or "Plaintiffs") submitted comments opposing the *Remand Results*. The Viraj Group submitted comments in support. The original determination under review is *Stainless Steel Bar from India; Final Results of Antidumping Duty Administrative Review*, 67 Fed. Reg. 45,956 (July 11, 2002) ("*Final Results*"), *amended by* 67 Fed. Reg. 53,336 (Aug. 15, 2002). The court has jurisdiction pursuant to 28 U.S.C. § 1581(c) (2000).

---

[1] This case does not involve partial collapsing.

## II. STANDARD OF REVIEW

The court "must sustain 'any determination, finding or conclusion found' by Commerce unless it is 'unsupported by substantial evidence on the record, or otherwise not in accordance with the law.'" *Fujitsu General Ltd. v. United States*, 88 F.3d 1034, 1038 (Fed. Cir. 1996) (quoting 19 U.S.C. § 1516a(b)(1)(B)). Substantial evidence is "[m]ore than a mere scintilla;" it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. of New York v. NLRB*, 305 U.S. 197, 229 (1938); *Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984). "In applying this standard, the court affirms [the agency's] factual determinations so long as they are reasonable and supported by the record as a whole, even if there is some evidence that detracts from the agency's conclusions." *Olympia Indus., Inc. v. United States*, 22 CIT 387, 389, 7 F. Supp. 2d 997, 1000 (1998) (citing *Atlantic Sugar, Ltd. v. United States*, 744 F.2d 1556, 1563 (Fed. Cir. 1984)). This court may not reweigh the evidence or substitute its own judgment for that of the agency. *See Granges Metallverken AB v. United States*, 13 CIT 471, 474, 716 F. Supp. 17, 21 (1989). Additionally, "absent a showing to the contrary, [the agency] is presumed to have considered all of the evidence in the record." *Nat'l Ass'n of Mirror Mfrs. v. United States*, 12 CIT 771, 779, 696 F. Supp. 642, 648 (1988). The court's inquiry is essentially into the reasonableness of the agency's determinations.

## III. DISCUSSION

In order to collapse companies for the purpose of calculating dumping margins, Commerce must first determine that the companies are "affiliated" under 19 U.S.C. § 1677(33)

(2000). Commerce must next determine that the companies "have production facilities for similar or identical products that would not require substantial retooling of either facility in order to restructure manufacturing priorities," and that "there is a significant potential for the manipulation of price or production." 19 C.F.R. § 351.401(f)(1).[2] This appeal pertains only to the "substantial retooling" prong of the regulation.

In *Slater I*, the court found Commerce's decision to collapse the Viraj Group companies unsupported by substantial evidence and ordered Commerce "to reconsider its analysis of the collapsing issue and, if necessary, to revise its dumping margin calculations in accordance with this opinion." *Slater I* at 1372. In addition, the court found Commerce's articulated reasons in support of its decision "inadequate." *Id.* at 1378. Focusing on Commerce's evaluation of the companies' production facilities, the court questioned whether the record indicates that the production facilities of the Viraj Group companies were complementary, rather than overlapping, and whether, therefore, "substantial retooling" would be required to bring the companies' production facilities on par with one another. *See id.* at 1376-79.

The record indicates the following production capabilities for the Viraj Group companies. VAL has the capability to produce steel billets and black bar (hot-rolled). *See Remand Results* at 8. VIL has the capability to further process the black bar into bright bar (cold-finished bar). *See id.* at 9. VIL cannot produce black bar on its own. Further, "VFL's primary production operation relates to producing stainless steel flanges." *Id.* at 10. VFL "has production facilities similar to those of VIL," but unlike VAL. *Id.* After remand, the question remains whether

---

[2] For ease of exposition, the court will refer to the first part of the collapsing regulation as the "substantial retooling" prong; and the second part, as the "manipulation" prong. The court notes that there is no statutory provision governing collapsing.

"substantial retooling" of their production facilities would not be required for these companies to divert production of subject merchandise from one another to take advantage of dumping margin differentials.

This case highlights the degree of confusion pertaining to the interpretation of the collapsing regulation, and the incongruity manifested in applying the regulation to the facts at hand. After due deliberation, the court finds that the *Remand Results* fall short of satisfying its order in *Slater I* because the *Remand Results* do not follow the collapsing regulation, and because Commerce did not provide the court with adequate factual support and justification in support of its decision to collapse the Viraj Group companies. The court once again remands the case to Commerce to reevaluate its collapsing decision, and specifically address and answer the questions that are raised in this opinion under separate subheadings.

**A. Commerce must explain why it did not analyze the "substantial retooling" prong of the collapsing regulation separately from the "manipulation" prong in this case.**

As urged by the domestic industry, *see Pls.' Comments* at 11-12, section 351.401(f)(1) has two distinct and separate parts, the "substantial retooling" and "manipulation" prongs, which are joined by the word "and." Because the regulation is conjunctive, each element has to be met. While the *Remand Results* contain sufficient evidence in support of the government's affirmative determination on the "manipulation" issue, the *Remand Results* do not provide sufficient evidence and analysis of "substantial retooling." The evidence Commerce cites in support of its decision to collapse all bear on the question of "manipulation." That evidence, however, is irrelevant in the analysis of "substantial retooling." The issue in this appeal (as it was in *Slater I*) is "substantial retooling." The *Remand Results* do not sufficiently address (and in fact distract

from) the examination of the companies' production facilities, which is the proper analysis of the "substantial retooling" question.

The government attempts to bring into its "substantial retooling" analysis the "manipulation" prong of the collapsing regulation by emphasizing that "the policy rationale of the collapsing regulation is to prevent affiliated companies with the same or similar production capabilities from *manipulating price or production activities* of subject merchandise to the affiliated company with the lowest margin, and thereby circumventing the antidumping law." *Remand Results* at 5 (citing and paraphrasing *Slater I* at 1376 in a misleading manner)[3] (emphasis added). The government justifies its approach by arguing that "the central question of the collapsing regulation" is the price or production "manipulation" issue. *Remand Results* at 6 (citing *Queen's Flowers DeColumbia v. United States*, 21 CIT 968, 979, 981 F. Supp. 617, 628 (1997)) & at 11 (citing *Antidumping Duties; Countervailing Duties*, 62 Fed. Reg. 27, 296, 27,346 (May 19, 1997) ("*Preamble*")).

In making the "manipulation" issue the "central question" in this appeal, Commerce lists a number of factors that need to be examined with respect to the "manipulation" issue pursuant to 19 C.F.R. § 351.401(f)(2). For example, Commerce points out that the Viraj Group companies "are sufficiently intertwined and have similar production capabilities." *Id.* at 6. Commerce reiterates that "the Viraj Group is a large, integrated, multinational entity in which two

---

[3] Despite the government's attempt to paraphrase the court's language to include the "manipulation" issue, the exact quote from *Slater I* is: "The policy rationale behind collapsing is to prevent affiliated exporters with same or similar production capabilities *to channel production* of subject merchandise through the affiliate with the lowest potential dumping margin and thereby circumvent the United States antidumping law." *Slater I* at 1376 (emphasis added). *Slater I* did not reach the "manipulation" issue. *Id.* at 1375 n.8.

individuals hold the majority of shares, either directly or, along with friends and relatives and their promoted companies." *Id.* at 11 (quoting Viraj Group's June 29 and November 26, 2001 questionnaire responses) (internal quotation marks omitted). Further, "[t]hese same two individuals are also the managing directors of all three affiliates;" "[t]he selling and production activities for bar during the period of review at VIL and VAL are controlled by these directors;" "[t]hrough personal guarantees, these same two individuals also enabled VIL and VFL to secure loans that they may not otherwise have received;" "[i]n fact, VIL received a loan for working capital which was not only guaranteed by the directors but also by VAL;" "[i]n addition, the directors made direct loans to VAL and VFL;" "VAL, VIL, and VFL's production facilities are all located in the same city" and "positioned hardly 20 meters away from each other." *Id.* at 12 (quotation marks omitted). To the extent all this information relates to 19 C.F.R. § 351.401(f)(2), which contain the "manipulation" factors to be examined, the court finds the information unhelpful for the purposes of reviewing Commerce's decision that "substantial retooling" would not be necessary.

Moreover, Commerce's recent practice in collapsing is "to refrain from collapsing firms when there are differences in production facilities that would require substantial retooling." *Certain Porcelain-on-Steel Cookware From Mexico: Final Results of Antidumping Duty Administrative Review*, 62 Fed. Reg. 42,496, 42,497 (Aug. 7, 1997) ("*Porcelain-on-Steel*"). Commerce does not reach the "manipulation" issue when the "substantial retooling" prong of the regulation is not met. *See Certain Welded Carbon Steel Pipes and Tubes from Thailand: Preliminary Results of Antidumping Duty Administrative Review*, 63 Fed. Reg. 16, 974, 16,976 (April 7, 1998) ("*Steel Pipes*") ("Because we determine that the second[, "substantial retooling,"]

criterion is not satisfied, it is not necessary to consider the third criterion in the collapsing

analysis -- identifying the potential for manipulation of price or production."). Commerce

specifically rejected a "totality of circumstances" approach in favor of its current practice. *See*

*Porcelain-on-Steel* at 42,497. Under the "totality of circumstances" approach, examining

production facilities was a factor considered in collapsing, and no one factor was dispositive. *See*

*Final Determinations of Sales at Less Than Fair Value: Certain Hot-Rolled Carbon Steel Flat*

*Products, Certain Cold-Rolled Carbon Steel Flat Products, and Certain Corrosion-Resistant*

*Carbon Steel Flat Products from Japan*, 58 Fed. Reg. 37,154, 37,159 (July 9, 1993) (considering

factors, such as "degree of voting control," "financial relationship," "intertwined" operations,

companies' "transactions with each other," and capability "of manipulating prices or affecting

production decisions, through their sales and production efforts," as well as production facilities).

The current form of section 351.401(f) that solidified Commerce's new collapsing practice was

adopted in 1997 and is explained in the Preamble, which seeks to clarify the "degree of confusion

concerning [Commerce's] practice of collapsing." *Preamble* at 27,345. That confusion seems to

have survived into Commerce's handling of the Viraj companies' case.

   The Preamble is clear in its insistence on a separate analysis of "substantial

retooling":

> In addition to finding a significant potential for manipulation, [Commerce] *also*
> *must find the requisite type of production facilities*. To clarify this point, we have
> revised paragraph (f) so that paragraph (f)(1) refers to the two basic elements,
> while paragraph (f)(2) contains the non-exhaustive list of factors that [Commerce]
> will consider in determining whether there is a significant potential for
> manipulation.

*Preamble* at 27,346 (emphasis added). Furthermore, to the extent that *Queen's Flowers,* which

the government cites in support of its assertion, examined an agency determination that had

predated the new regulation, the view of the *Queen's Flowers* Court on collapsing is not directly

on point here. The regulation and, accordingly, the agency's practice on collapsing have changed

since the *Queen's Flowers* decision.[4]

It is imperative that an agency follow its own regulations. *See Slater I* at 1378 (citation

omitted). Commerce asserts that it has "discretion" to collapse the Viraj Group companies.

*Remand Results* at 5 (citation omitted). However, the agency does not have discretion to violate

a rule it adopted after notice and comment, fulfilling a legislative function. *See United States v.*

*Nixon*, 418 U.S. 683, 694-96 (1974). The government reiterates that "the collapsing analysis

must be made with a keen understanding of all of the facts of the case, taken as a whole, rather

than any individual piece of the analysis being the ultimate determinative factor." *Remand*

*Results* at 20 (citing its Draft Remand at 13). While this may be true, the new collapsing

regulation on its face (and as explained in the Preamble) demands a separate analysis and a

separate finding on the issue of "substantial retooling."

In tandem, while the agency "may depart from its earlier determinations and its own prior

precedent, whatever the ground for departure from prior norms, however, it must be clearly set

forth so that the reviewing court may understand the basis of the agency's actions and so may

judge the consistency of that action with the agency's mandate." *Marine Harvest (Chile) S.A. v.*

*United States*, 26 CIT __, 244 F. Supp. 2d 1364, 1380 (2002) (citations and internal quotation

marks omitted). In its *Remand Results* Commerce should have clearly articulated to the court its

reasons for the deviation from its current practice of analyzing the "substantial retooling" prong

---

[4] Defendant's credibility is not enhanced by its failure to bring this fact to the court's attention.

separately, *see, e.g., Steel Pipe* at 16,976, and why it chose to engage in a type of "totality of

circumstances" approach in this case, which it has otherwise abandoned.

In subsequent remand, Commerce must focus on the companies' production facilities and

on whether or not "substantial retooling" of facilities would be required "in order to restructure

manufacturing priorities." 19 C.F.R. § 351.401(f)(1). And it must do so without reference to the

factors that bear on the "manipulation" issue in support. This is what is required under the

regulation, Commerce's own practice, and the Preamble.[5]

---

[5] The *Remand Results'* confusion relating to the application of the separate prongs is further exposed by Commerce's discussion of the *German Bar* case. *See Remand Results* at 13-14 (discussing *Notice of Final Determination of Sales at Less Than Fair Value: Stainless Steel Bar From Germany*, 67 Fed. Reg. 3159 (Jan. 23, 2002) ("*German Bar*")). Plaintiffs argue that the *German Bar* case does not support Commerce's decision to collapse the Viraj Group. In *German Bar*, Commerce determined that, even though the *German Bar* companies had production facilities that could produce similar and identical merchandise in a limited range of bar diameters, they "would need to add entire production lines, not merely retool the existing operations" in order "to meaningfully expand the range of sizes produced at either plant." *Issues and Decision Mem. accompanying German Bar* cmt. 15. In other words, the production lines had "limited" overlap. *Id.* In the *Remand Results*, Commerce answers Plaintiffs' argument by observing that the *German Bar* companies were not "collapsed because of the *combination* of a 'limited overlap' in production capabilities *and* significant corporate structural impediments of the [companies'] ability to manipulate pricing and production." *Remand Results* at 13 (emphasis in the original). In *German Bar*, however, Commerce engaged in an analysis of the "manipulation" issue, only because it found *some* overlap in the facilities, while cautioning that it was "[k]eeping in mind that the potential for manipulation is constrained by this limited overlap." The record here is equivocal about whether the Viraj Group companies' facilities have *any* overlap (let alone the "broad overlap" asserted by Commerce). The *German Bar* notice was very specific that the factors outlined in section 351.401(f)(2) implicated the "manipulation" issue, not the "substantial retooling" issue – an approach not taken, but should have been taken, by the *Remand Results*. Further, on the "manipulation" issue, the *German Bar* companies were owned by the same entity and had two common board members, whereas the Viraj Group does not have a common parent, but has common managing directors. *See Viraj Group's Reply to Pls.' Comments* at 4-5.

**B. In applying its collapsing regulation, Commerce must explain why it need not analyze the production facilities of each company and why in this case its analysis centered on the products the companies manufacture.**

*1. Commerce must explain why it need not examine the production facilities of each company involved in collapsing and why it need not address the possibility of shifting production among companies in either direction.*

Another question that relates to the proper interpretation of the "substantial retooling" prong of the collapsing regulation is whether Commerce must examine the production facilities of each company involved or whether it is sufficient for Commerce to examine the production facilities of only one company. The regulation reads "production facilities for similar or identical products that would not require substantial retooling of *either* facility in order to restructure manufacturing priorities." § 351.401(f)(1) (emphasis added). Plaintiffs interpret the regulation to mean that each company's production facilities need to be examined. *See Pls.' Comments* at 10 ("VAL, VIL, and VFL each lack similar production capabilities."). The court finds Plaintiffs' argument on this point persuasive.

The regulation appears to require that Commerce examine the production facilities of both (or all) companies and evaluate the possibility that production may be shifted from one company to another and *vice versa*. The first dictionary meaning of the word "either" is "each of the two." 5 OXFORD ENGLISH DICTIONARY 102 (2d ed. 1989). Moreover, when used with a plural noun, the proper word to replace "either" is "both." *Id.* These definitions seem to support Plaintiffs' position. On the other hand, a secondary definition of the word "either" is "one or other of the two." *Id.* This definition seems to support the government's position. This court will give substantial deference to the agency's reasonable interpretation of its own regulation unless it is plainly erroneous and inconsistent with the regulation. *See Mullins Coal Co. v.*

*Director*, 484 U.S. 135, 159 (1987) (citation and internal quotation marks omitted).  However, given two competing interpretations of the regulation and the record evidence in this case of very sparse of overlap of production facilities combined with the concern that collapsing the Viraj Group may lead to circumventing the United States antidumping duty law, the court requires more explanation from Commerce why its interpretation of the regulation is reasonable in this case.  Specifically, Commerce must look further into the possibility that the Viraj Group affiliates may not be able to shift production from VAL to VIL (or VFL) without "substantial retooling."

Here, Commerce focused solely on the production facilities of VAL in finding that "VAL could add bright bar finishing operations [which VIL already has] for less than 10 percent of its current fixed asset value" and in finding that this percentage does not constitute "substantial retooling." *Remand Results* at 9.  With respect to VIL, Commerce simply observed that "VIL has the ability to purchase black bar on the open market, rather than from VAL, and process it into bright bar using the production facilities it already has."[6]  *Id.*  Accordingly, Commerce concluded that "VAL and VIL have production facilities to make similar or identical products without substantial retooling of VAL's production facility in order to restructure manufacturing priorities." *Id.*

While not sufficiently addressing whether VIL's facilities would need "substantial retooling," Commerce's determination does not address the possibility that VIL might receive a

---

[6] The court recognizes that VIL has the ability to purchase black bar on the open market. The record indicates that in the period of review either VAL supplied VIL with black bar or VIL leased VAL's facilities.  The *Remand Results* do not sufficiently address the concern that any transaction between VAL and VIL (or VFL) may not be at arm's-length.

lower margin than VAL.[7] *See Pls.' Comments* at 20. As it stands now, the record shows that

VIL does not have the production facilities required to produce the black bar or billet VAL

produces and that a substantial addition to VIL's facilities may be needed for VIL to produce

black bar or billet.[8] In the event that VIL receives a lower dumping margin than VAL, the Viraj

Group may not be able to divert the production of black bar to VIL without "substantial

retooling" of VIL's facilities. VIL on its own cannot produce black bar or billet. To produce

bright bar, VIL must purchase the input or the intermediate product, black bar, either from VAL

or from a third party. In the event VIL purchases black bar or billet from VAL, that purchase

may have to be examined with scrutiny because of the affiliated nature of the companies. Such

examination would not be possible if the companies were collapsed. *See Slater I* at 1377

(questioning whether the use of the "major input rule" under 19 U.S.C. § 1677b(f)(3) and 19

C.F.R. § 351.407(b), rather than collapsing, may be more appropriate in this case).[9]

---

[7] Commerce only gives the example of VAL receiving a lower margin.

[8] VIL may have to add, for instance, induction and refining furnaces and argon oxygen decarburiser converters to produce black bar. *See Slater I* at 1376-77. Whether or not this constitutes "substantial retooling" is a question Commerce must decide.

[9] Furthermore, there is still the question of whether or not there was a leasing arrangement between VIL and VAL during the period of review, which would have allowed VIL to use VAL's facilities for the production of hot-rolled round bar and billet. Commerce now announces that "the leasing agreements were not a determinant factor in [Commerce's] collapsing determination in this case." *Remand Results* at 16; *see also Def.'s Response* at 15 ("The alleged leasing agreement [is] not part of Commerce collapsing analysis."). Contrary to the government's surprising assertion here, in the *Final Results* Commerce specifically based its determination to collapse on its finding that "VAL and VIL can produce subject merchandise (*i.e.*, similar or identical products) and can continue to do so, independently or under existing leasing agreements, without substantial retooling of their production facilities." Issues and Decision Mem. accompanying *Final Results* cmt. 1. Again because a leasing arrangement, if any, would constitute a transaction between affiliated entities, it may have to be examined with special scrutiny – which examination Commerce's decision to collapse the Viraj Group

While lacking the analysis of VIL's production facilities, the *Remand Results* are also

perfunctory with respect to VFL's production facilities. As recognized by Commerce, "VFL's

primary production operation relates to producing stainless steel flanges, and therefore, some of

its production machinery is used exclusively for producing flanges," and not bar. *Remand*

*Results* at 10. While, as admitted by Commerce itself, *see id.*, the focus should be on the

company's production facilities, rather than the question of whether or not VFL produces subject

merchandise, the court's concerns relating to the insufficient analysis of VIL's capabilities are

equally implicated with respect to VFL's capabilities. As Commerce says, "VFL . . . has

production facilities similar to those of VIL." *Id.* In particular, "VFL also has heating and

annealing capabilities" without the capability to make black bar. *Id.* Notwithstanding the new

information that VFL installed facilities for and produced and sold "forged rounds/*bars*/rods," *id.*

(internal quotation marks omitted), Commerce does not point to any evidence in the record that

VFL has the capability to produce black or bright bar.[10]

> *2. Commerce must explain why in this case it focused on the products the companies' manufacture, rather than their production facilities.*

Intertwined with the question as to whether each company's production facilities need to

be evaluated is the related issue of whether the collapsing regulation refers to production

companies does not allow.

[10] Plaintiffs state: "VFL does not make any bar products but may have annealing capabilities to make one intermediate product, HRAP [(hot-rolled, annealed, pickled)] bar; its heavy forge equipment may be able to make large forged bar unlike either VAL's black bar or VIL's bright bar." *Pls.' Comments* at 26. That is, in the event Commerce finds after reconsideration that VIL and VAL should be collapsed, it has to further explain how production facilities used to make forged bar and production facilities used to make black or bright bar are overlapping.

facilities or product lines. Commerce states that the court "has specifically allowed for

differences between production lines and products." *Id.* at 11 (citing *Marine Harvest*, 244 F.

Supp. 2d at 1367-68 n.8).[11] In fact, Commerce centers a significant portion of its discussion in

the *Remand Results* on the fact that black bar and bright bar are both subject merchandise defined

by the scope of the administrative review, *see Final Results* at 45,957, and concludes that,

therefore, VAL and VIL have production facilities that would not require "substantial retooling."

*See Remand Results* at 6-7.

As Plaintiffs rightly observe, *see Pls.' Comments* at 5-6, Commerce's interpretation of

section 351.401(f)(1) in this manner would render a part of the "substantial retooling" prong

hollow. Again, the regulation reads "production facilities for similar or identical products that

would not require substantial retooling . . . in order to restructure manufacturing priorities." §

351.401(f)(1). It is insufficient for Commerce to declare that, because black and bright bar are

similar products under the definition of subject merchandise, their production facilities do not

require "substantial retooling."[12] In order to be able to collapse the Viraj Group, Commerce must

---

[11] The issue implicated in *Marine Harvest* was the successor-in-interest test, not a decision to collapse. Moreover, the *Marine Harvest* companies' production relationships were different than the Viraj Group companies: they did not produce the intermediate and the finished product respectively, as do the Viraj Group companies.

[12] The subject merchandise is defined in the *Final Results* as follows:

Imports covered by this review are shipments of stainless steel bar ("SSB"). SSB means articles of stainless steel in straight lengths that have been either hot-rolled, forged, turned, cold-drawn, cold-rolled or otherwise cold-finished, or ground, having a uniform solid cross section along their whole length in the shape of circles, segments of circles, ovals, rectangles (including squares), triangles, hexagons, octagons, or other convex polygons. SSB includes cold-finished SSBs that are turned or ground in straight lengths, whether produced from hot-rolled bar or from straightened and cut rod or wire, and reinforcing bars that have indentations, ribs, grooves, or other deformations produced during the rolling process.

specifically address the question that the companies' production facilities for similar products

would not require "substantial retooling." *Cf. Issues and Decision Mem. accompanying German*

*Bar* cmt. 15 ("section 351.401(f)(1) concentrates not on a firm's product line, but rather on its

production facilities.").

Despite the fact they may both be subject merchandise, the record indicates that the

production facilities needed for the production of black bar and bright bar may not be similar.

The record shows that the black bar produced by VAL is an input in the production of bright bar

(produced by VIL). VIL's function in the production of bright bar is "finishing" the product at

the last stage of production. "VIL picks up where VAL leaves off." *Pls.' Comments* at 9.

Further, VAL supplies VFL with billet which VFL on its own cannot produce. So far Commerce

has not demonstrated that VAL, VIL, and VFL can shift production of black or bright bar (or, for

that matter, any other product) from one another without "substantial retooling" of their facilities,

thereby avoiding high dumping margins and circumventing the United States antidumping law.

*See Slater I* at 1376.[13]

---

Except as specified above, the term does not include stainless steel semi-finished products, cut length flat-rolled products (i.e., cut length rolled products which, if less than 4.75 mm in thickness, have a width measuring at least 10 times the thickness, or, if 4.75 mm or more in thickness, have a width which exceeds 150 mm and measures at least twice the thickness), wire (i.e., cold-formed products in coils, of any uniform solid cross section along their whole length, which do not conform to the definition of flat-rolled products), and angles, shapes and sections.

[13] In *Slater I*, the court also ordered Commerce to explain its turnabout relating to the nature of the companies production facilities. *See Slater I* at 1379. In particular, in its preliminary results Commerce determined that the Viraj Group companies' production facilities are "complementary," while in the *Final Results* it determined that they are "overlapping." The corollary to the "substantial retooling" question is whether the companies' production facilities have a "broad overlap." In the *Remand Results* Commerce answered the court's concerns by maintaining that "both descriptions are true." *Remand Results* at 12. As explained above,

**C.  Commerce must explain why an investment even if worth less than 10 percent of a company's fixed asset value does not constitute "substantial retooling" and why this figure by itself is sufficient to make Commerce's "substantial retooling" determination reasonable.**

Commerce determined that "VAL could add bright bar finishing operations (e.g., pickling and annealing operations) for less than 10 percent of its current fixed asset value" to be able to produce the bright bar.[14]  *Remand Results* at 9.  Commerce further determined that this potential investment does not constitute "substantial retooling."  However, it is hardly possible to evaluate whether this number is significant when it is not presented in context and in relation to a reference point.  At first glance, an investment that costs less than 10 percent of fixed value of a company's assets, to the extent that cost approaches 10 percent, seems to be a significant outlay. Commerce must explain to the court why it determines that an investment that may approach 10 percent of VAL's fixed asset value is not "substantial."  Moreover, Commerce must tell the court whether any other consideration, beside the monetary value of the investment, may implicate the "substantial retooling" question, such as time that may have to be spent or other constraints on

---

Commerce based this assertion on the detail that black and bright bar are both subject merchandise.  This assertion does not, however, resolve the question whether the production facilities of the black and bright bar are "overlapping" to a sufficient degree.  So far, it appears that their production facilities are complementary, with little or no overlap.

[14] Commerce must also explain to the court whether VAL, by merely adding annealing and pickling operations, could produce the cold-rolled bright bar that VIL produces.  *See Pl.'s Comments* at 18 (asserting that the addition of annealing and pickling equipment would merely enable VAL to make hot-rolled, annealed, pickled bar [HRAP] and that to produced cold-finished bar, VAL has to also add cold-turning, -polishing, -rolling, -grinding, and -drawing equipment).  The government answers that the 10 percent figure encompasses these finishing equipment, and only points to the Viraj Group's June 29 questionnaire response at 90 and 73. *See Def.'s Response* at 11.

the company's finances.[15]

It is well-known that a decision to collapse is "very much fact-specific in nature, requiring case-by-case analysis." *Preamble* at 27,346. However, presenting a raw number without more does not give the court the opportunity to review Commerce's decision in a meaningful way. This court may not accept Commerce's assertions on faith, but is required to evaluate whether they are reasonable inferences based on facts. *See Atlantic Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984) ("substantial evidence on the record means more than a mere scintilla and such relevant evidence as a reasonable mind might accept as adequate to support a conclusion, taking into account the entire record, including whatever fairly detracts from the substantiality of the evidence") (citation and internal quotation marks omitted).

To illustrate how the citation of one value out of context does not lend itself to a meaningful review, it is instructive to look at Plaintiffs' counter-argument. Plaintiffs would like the court to hold that "substantial retooling" would be required of VAL's facility to produce bright bar. *See Pls.' Comments* at 21. To advance this position, Plaintiffs argue that Commerce must not ignore "the magnitude of the absolute value of the expense of retooling for VAL," in favor of the percentage value cited by Commerce. *Id.* at 22. To that end, Plaintiffs give the court yet another number: retooling VAL's facility would "equal to over half a million dollars in assets." *Id.* More persuasively, Plaintiffs add that "VFL would have to increase its investments

---

[15] The need to provide sufficient context and a reference point can be illustrated with the following examples. (These examples are for illustration only.) To wit, expending close to 10 percent of fixed asset value may be a relatively insignificant investment for a large and diversified company, while such an investment may not be feasible for a smaller company. Or a less than 10 percent investment may be insubstantial under industry norms. Moreover, if an investment would take longer to implement than the period the companies are under review, that investment may constitute "substantial retooling."

in plant and machinery assets by almost Rs. [(Rupees)] 175 million in order to create a production facility similar to that of VAL." *Id.* at 19. And "[t]his is prohibitive for a company that only posted a net profit in [Fiscal Year] 2000 of less than Rs. 14 million – and would qualify by any measure as a 'substantial retooling' investment." *Id.*

The question is whether any numbers cited would reasonably support the conclusion that the required investment would not be "substantial." Therefore, Commerce needs to justify its position more fully and more responsively. Instead, Commerce merely replies to Plaintiffs' comments that "[o]bviously, Commerce looks at the relative proportion of the fixed assets when conducting such an analysis because the absolute values are meaningless when considering whether adding such facilities would be substantial for a particular company." *Def.'s Response* at 11-12. This is an inadequate explanation. Commerce must explain to this court why the number it cites as the value of new potential investment (either in percentages or in absolute terms) in the *Remand Results* would not reasonably constitute "substantial retooling" within the meaning of the regulation.

**D. Commerce must explain why it finds unnecessary to address the relative merits of collapsing and the major input rule as they relate to the facts of this case.**

In *Slater I*, the court suggested that the application of the "major input rule" pursuant to 19 C.F.R. § 351.407(b)[16] may have been more appropriate in this case, as opposed to collapsing

---

[16] Section 351.407 (Calculation of constructed value and cost of production) reads:

(a) Introduction. This section sets forth certain rules that are common to the calculation of constructed value and the cost of production. (See section 773(f) of the Act.)
(b) Determination of value under the major input rule. For purposes of section 773(f)(3)of the Act[, 19 U.S.C. § 1677b(f)(3)], the Secretary normally will determine the value of a major input purchased from an affiliated person based on the higher of:
(1) The price paid by the exporter or producer to the affiliated person for the major input;

the companies. *See Slater I* at 1377. Plaintiffs have repeatedly raised the same issue in their comments to the agency and the court. Instead of addressing the issue, the government merely observes that "[b]ecause [the major input] provision only applies to transactions between affiliated persons, once [Commerce] decided to collapse and treat the companies as one 'person' for the purposes of the antidumping analysis, it is not statutorily required to apply the provision." *Remand Results* at 15 (citation omitted). The government continues, "[i]n this case, [Commerce] determined that the Viraj Group companies is one entity and, therefore, the major input rule does not apply in this situation."[17] *Id.*

There is no question that, when Commerce determines to collapse the companies, the major input rule does not apply because the rule relates to the examination of transactions between affiliates and, once the affiliates are treated as one entity, there is no reason or opportunity to examine such transactions. However, the position that the major input rule does not apply here because Commerce had already determined to collapse the Viraj Group companies is a *non sequitur*. Given the court's concerns in *Slater I* regarding affiliate transactions among the Viraj Group companies, the government needs to examine the relative merits of collapsing *vis a vis* the major input rule as applied or applicable to the facts of this case. *See Slater I* at 1377. That is to say that Commerce must directly refer to the Viraj Group companies' production relationships which the record shows to be more like a supplier and a buyer, and

---

(2) The amount usually reflected in sales of the major input in the market under consideration; or
(3) The cost to the affiliated person of producing the major input.

[17] Elsewhere (in reply to Plaintiffs' comments), the government also states that "[b]ecause we have determined to continue to collapse the Viraj Group companies, we did not address the plaintiffs' suggestions with respect to 'the major input rule' in the remand redetermination." *Remand Results* at 16.

complementary. Two of the companies (VIL and VFL) reportedly buy a major input used in their production facilities from an affiliate (VAL).[18] If the production facilities of the companies are indeed complementary, collapsing the Viraj Group may lead to potential misstatements in the disclosure of the companies' cost structures and manipulation of dumping margin calculations that should (and could) not be permitted under the statute.

## IV. CONCLUSION AND ORDER

For all the foregoing reasons, the court finds that the *Remand Results* fall short of satisfying the court's instructions in *Slater I.* Commerce must address and answer the points that are raised under separate subheadings in this opinion. Therefore, it is hereby

ORDERED that the case is remanded to Commerce to reevaluate its collapsing decision; it is further

ORDERED that Commerce shall have sixty (60) days, until May 7, 2004, to complete

---

[18] Or (if this matter were ever to be resolved) VIL uses VAL's facilities under an exclusive leasing arrangement. In addition to asserting that Commerce's decision was not based on the existence of a leasing arrangement in the period of review, *see* note 9, the *Remand Results* also observe that Commerce first heard of the existence of a leasing agreement when it received the Viraj Group's Rebuttal Brief. *See Remand Results* at 15. With these remarks Commerce implies that it is now not basing its decision to collapse on the leasing agreements, even though it seemed to do so in the *Final Results*. Not only does this court find the less than ideal clarity of the record in this case disheartening, but also agrees with Plaintiffs that the record at a number of places contains an *indication* of this leasing arrangement. The court here will not pass judgment on Plaintiffs' assertion, which incidentally elicited no response from the government, that "the very fact of an affiliate [(VIL)] resorting to operational leasing of another affiliate's [(VAL's)] production/equipment facility is per se evidence that it does not, on its own, have that production capability." *Pls.' Comments* at 14. Commerce, however, must address the issue of these leasing arrangements and explain to the court why it changed its position regarding such arrangements in its decision to collapse the Viraj Group companies and in its continuing defense of that decision.

and file its review.  Plaintiffs and Defendants-Intervenor shall have thirty (30) days from that

filing to file comment(s), and any reply by Commerce shall be due twenty (20) days after

Plaintiffs' comment(s) are filed.


Dated : March 8, 2004                              /s/Judith M. Barzilay

     New York, New York                       Judith M. Barzilay