# United States Court of Appeals for the Federal Circuit

2006-1158


VIRAJ GROUP,

Plaintiff-Appellant,

v.

UNITED STATES,

Defendant,

and

SLATER STEELS CORPORATION,
CARPENTER TECHNOLOGY CORPORATION,
ELECTRALLOY CORP., CRUCIBLE SPECIALTY METALS DIVISION,
and CRUCIBLE MATERIALS CORP.,

Defendants-Appellees.


<u>Daniel P. Wendt</u>, Miller & Chevalier, Chartered, of Washington DC., argued for plaintiff-appellant.   On the brief was <u>Peter J. Koenig</u>.  Of counsel was <u>Jeffery C. Lowe.</u>

<u>Robin H. Gilbert</u>, Kelley Drye Collier, Shannon, of Washington DC., argued for defendants-appellees, Slater Steels Corporation, et al.

Appealed from:   United States Court of International Trade.

Judge Judith M. Barzilay

# United States Court of Appeals for the Federal Circuit

2006-1158

VIRAJ GROUP,

Plaintiff-Appellant,

v.

UNITED STATES,

Defendant,

and

SLATER STEELS CORPORATION,
CARPENTER TECHNOLOGY CORPORATION,
ELECTRALLOY CORP., CRUCIBLE SPECIALTY METALS DIVISION,
and CRUCIBLE MATERIALS CORP.,

Defendants-Appellees.

_____

DECIDED: February 13, 2007
_____

Before NEWMAN, LINN, and MOORE, Circuit Judges.

MOORE, Circuit Judge.

Viraj Group appeals the decision of the United States Court of International Trade instructing the United States Department of Commerce ("Commerce") to treat the Viraj Group companies as separate entities for purposes of calculating an antidumping duty on stainless steel bar imports from India. Slater Steels Corp. v. United States, 27 I.T.R.D. (BNA) 1486 (Ct. Int'l Trade 2005) ("Slater III"). As instructed, Commerce calculated separate antidumping duties for the Viraj Group entities but stated that it

believed the Viraj Group companies should be treated as one entity for the duty calculation. Redetermination Pursuant to Remand (III), Consol. Court No. 02-00551, slip op. 05-23 (July 15, 2005) ("Remand Results III"). The Court of International Trade affirmed the imposition of separate antidumping duties. Slater Steels Corp. v. United States, 395 F. Supp. 2d 1353 (Ct. Int'l Trade 2005) ("Slater IV"). This appeal followed.

Appellant argues that the Court of International Trade erred by finding that Commerce had a prior practice of not collapsing the Viraj Group in other antidumping reviews. Appellant further argues that Commerce's interpretation of its collapsing regulation is correct, and that in accordance with that regulation, the Viraj Group entities should be collapsed for purposes of calculating an antidumping duty.

We agree. Accordingly, we reverse the Court of International Trade's decisions in Slater III and Slater IV, and instruct the Court of International Trade to vacate Commerce's imposition of separate antidumping duties, or margins, and reinstate Commerce's prior antidumping duty calculation for the Viraj Group as a collapsed entity.

BACKGROUND

I

Congress has created a system for investigating and resolving antidumping disputes. According to this system, Commerce must make a determination as to whether the subject merchandise is being or is likely to be sold in the United States at "less than fair value." 19 U.S.C. § 1673d(a)(1) (2000). The International Trade Commission ("ITC") must determine whether a domestic industry exists that would suffer material injury from the dumping activity. Id. § 1673d(b)(1). If both findings are affirmative, the importer is subjected to an antidumping duty, which is intended to

equalize the prices between comparable goods sold in the United States and the importer's home market.  See id. § 1673 (2000).

To carry out its obligations in the antidumping context, Commerce has promulgated regulations that guide its analyses.  At issue in the present case is the treatment of affiliated companies for purposes of calculating the antidumping duty under 19 C.F.R. § 351.401(f)(1).  The regulation provides:

> In an antidumping proceeding under this part, the Secretary will treat two or more affiliated producers as a single entity where those producers have production facilities for similar or identical products that would not require substantial retooling of either facility in order to restructure manufacturing priorities and the Secretary concludes that there is a significant potential for the manipulation of price or production.

19 C.F.R. § 351.401(f)(1) ("collapsing regulation").  Specifically, this appeal questions whether the Viraj Group meets each of the requirements set forth in Commerce's collapsing regulation, such that Commerce should treat the Viraj Group entities as one company when calculating an appropriate dumping margin.

II

In 1995, Commerce issued the antidumping order central to this dispute, covering stainless steel bars from India.  Stainless Steel Bar from Brazil, India, and Japan, 60 Fed. Reg. 9,661 (Dep't of Commerce Feb. 21, 1995) ("the SSB Order").  Under an antidumping order, such as the SSB Order, Commerce is required to conduct an administrative review for each new importer of the subject merchandise as well as to review entries for subject merchandise for any prior one-year period upon request.

The present review involves Viraj's stainless steel bar imports during the period from February 1, 2000 to January 31, 2001 ("the '00-'01 POR").  For the '00-'01 POR, the relevant Viraj Group companies are: (1) Viraj Impoexpo, Ltd. ("VIL"), (2) Viraj Alloys,

Ltd. ("VAL"), and (3) Viraj Forgings, Ltd. ("VFL"). The subject merchandise includes two types of steel bar products, stainless steel hot-rolled bar ("black bar") and stainless steel cold-rolled bar ("bright bar").

In 2002, Commerce made a final determination that the Viraj Group should be collapsed (i.e., treated as a single entity) for calculating its dumping margin, and it assigned the Viraj Group a single de minimis dumping margin of 0.47%. Stainless Steel Bar from India, 67 Fed. Reg. 45,956 (Dep't of Commerce July 11, 2002) (final admin. review). On appeal, the Court of International Trade questioned Commerce's decision to collapse, focusing primarily on whether the Viraj Group companies had the type of production capabilities required under the collapsing regulation to support Commerce's decision. Slater Steels Corp. v. United States, 279 F. Supp. 2d 1370, 1376-79 (Ct. Int'l Trade 2003) ("Slater I"). Finding that Commerce's decision was not supported by substantial evidence, the Court of International Trade remanded to Commerce to reanalyze the collapsing decision and "if necessary, to revise its dumping margin calculation." Id. at 1379.

Commerce thereafter reconsidered its collapsing analysis and again determined that collapsing was permissible under its regulation because VAL could produce equivalent products as VIL by adding annealing and pickling equipment to its facilities. Final Results of Redetermination Pursuant to Remand (I), Consol. Court No. 02-00551, slip op. 03-108, at 9 (Oct. 24, 2003) ("Remand Results I"). This retooling was not "substantial" because Commerce estimated that it would require "less than 10 percent of [VAL's] current fixed asset value" to carry out. Id. On appeal, the Court of International Trade disagreed with Commerce's interpretation of its collapsing regulation

as not requiring analysis of the retooling that <u>each</u> company would need in order to produce similar or identical products. <u>Slater Steels Corp. v. United States</u>, 316 F. Supp. 2d 1368, 1375 (Ct. Int'l Trade 2004) ("<u>Slater II</u>"). The Court of International Trade remanded again, concerned that Commerce focused solely on the retooling that VAL would need to produce VIL's products, without consideration of the retooling VIL would need to produce VAL's products. <u>Id.</u> In <u>Slater II</u>, the Court of International Trade also questioned how Commerce determined that less than ten percent of a company's fixed assets did not constitute "substantial retooling." <u>Id.</u> at 1379. Finally, the Court of International Trade criticized Commerce's failure to address whether the "major input rule" might have been more appropriate than collapsing for treatment of the affiliated Viraj Group companies. <u>Id.</u> at 1380.

On remand again, Commerce addressed each of the concerns that the Court of International Trade raised in <u>Slater II</u>. <u>Final Results of Redetermination Pursuant to Remand</u> (II), Consol. Court No. 02-00551, slip op. 04-22 (May 7, 2004) ("<u>Remand Results II</u>"). Commerce explained that the regulation states collapsing is appropriate where substantial retooling would not be required for "either facility," which means that Commerce needs only to consider whether retooling could occur in one direction. <u>Id.</u> at 9-21. Commerce also explained that its ten percent estimation was conservative and detailed why a more precise calculation (2.88%) did not amount to a "substantial retooling." <u>Id.</u> at 33-38. Finally, Commerce defended its practice of not considering the major input rule in its collapsing analysis. <u>Id.</u> at 38-41.

Slater Steels Corporation ("Slater") appealed this decision to the Court of International Trade. Before the court ruled on the appeal, Slater submitted an <u>ex parte</u>

letter to the court, asking the court to consider its intervening decision in <u>Carpenter</u> <u>Technology Corp. v. United States</u>, 344 F. Supp. 2d 750 (Ct. Int'l Trade 2004) ("<u>Carpenter</u>"). In <u>Carpenter</u>, the Court of International Trade considered the dumping margins assessed on the Viraj Group under an unrelated antidumping order involving wire rods ("the Wire Rod Order"). The Court of International Trade, in <u>Carpenter</u>, reversed a decision by Commerce to collapse the Viraj Group for the review because it found that collapsing was inexplicably inconsistent with Commerce's prior treatment of the Viraj Group under the Wire Rod Order. <u>Id.</u> at 755. Specifically, during an earlier review period under the Wire Rod Order, Commerce affirmatively decided not to collapse the Viraj Group, a decision that was affirmed by the Court of International Trade on appeal. <u>Viraj Group Ltd. v. United States</u>, 162 F. Supp. 2d 656 (Ct. Int'l Trade 2001). Accordingly, in <u>Carpenter</u>, the court would not allow Commerce to depart from its prior practices under the Wire Rod Order without valid reason. After reviewing <u>Carpenter</u> and its possible implications in the present review, the court issued a letter on October 5, 2004, asking Commerce to "indicate what, if any, factual changes have occurred prior to the ['00-'01 POR] such that its decision to collapse the Viraj Group companies should not be remanded as it was in <u>Carpenter</u>?"

Commerce responded to the court's October 5th letter in a memorandum dated November 12, 2004. Commerce's memorandum explained at length how the underlying decision in <u>Carpenter</u> should not impact its decision in the current review because it involved "different products; a different production process; different case history . . . a different period of review; and different facts specifically contained in the administrative record under review." Commerce's memorandum further addressed

treatment of the Viraj Group under the SSB Order. Commerce erroneously stated that the Viraj Group had only once before been reviewed under the SSB Order during a period of review from 1998-1999 ("the '98-'99 review"). In the '98-'99 review, Commerce explained that it did not make an explicit determination as to whether or not to collapse the Viraj Group due to insufficiencies in the Viraj Group's questionnaire responses. Instead, Commerce applied adverse facts to the Viraj Group for its Preliminary Results, and applied neutral available facts to the Viraj Group for its Final Determination. See 65 Fed. Reg. 48,965 (Dep't of Commerce Aug. 10, 2000); 65 Fed. Reg. 12,209 (Dep't of Commerce Mar. 8, 2000). Commerce reasoned that nothing in the '98-'99 review prevented it from affirmatively collapsing the Viraj Group in the current review.

Slater responded to the Court of International Trade's inquiry and Commerce's memorandum, noting that the Viraj Group had been reviewed prior to the '98-'99 review under the SSB Order. Specifically, in 1995, when the Viraj Group began importing stainless steel bars into the United States, it took part in a new shipper review ("the new shipper review"). Slater argued that the record shows that Commerce "made a decision not to collapse the Viraj Group companies" in the new shipper review. This was evident, Slater contended, from Commerce's use of the price paid by VIL to VAL as the input price in calculating VAL's production costs. Thus, for the first time, the actions of Commerce in the new shipper review became part of the record for the '00-'01 POR.

The Court of International Trade considered the submissions of Commerce and Slater and found that Commerce's decision in the '00-'01 POR to collapse the Viraj Group was inconsistent with Commerce's previous determinations and Commerce had

not provided an adequate explanation for departure therefrom. <u>Slater III</u>, 27 I.T.R.D. 1486, at *18-22. Thus, the court held that Commerce's "prior practice" dictated the result, and the Court of International Trade instructed Commerce not to collapse the Viraj Group, but rather, to calculate and impose individual dumping margins upon VAL and VIL/VFL.[1] <u>Id.</u> at *24.

Commerce complied with the court's instruction in <u>Remand Results III</u>, calculating separate dumping margins for VAL and VIL/VFL.[2] Commerce stated, however, that it "respectfully disagrees with the Court's order" and that it continued to believe that collapsing the Viraj Group was appropriate for the '00-'01 POR. <u>Remand Results III</u>, at 5. In addition, Commerce disagreed with the Court of International Trade's finding that Commerce had a "prior practice" of not collapsing the Viraj Group during the reviews under the SSB Order. Commerce concluded that collapsing the Viraj Group for the '00-'01 POR was not inconsistent with its prior actions. <u>Id.</u> at 9-12.

The Court of International Trade affirmed Commerce's dumping margin calculation in <u>Remand Results III</u>. <u>Slater IV</u>, 395 F. Supp. 2d at 1353. Viraj Group challenges those decisions on appeal. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(5).

---

[1] The court noted that neither party objected to Commerce's decision to collapse VIL with VFL. Accordingly, the Court of International Trade did not consider whether that collapsing determination was proper, stating "Commerce may consider collapsing VIL and VFL in accordance with the court's opinions in <u>Slater I</u> and <u>Slater II</u>." <u>Slater III</u>, 27 I.T.R.D. 1486, at *24.

[2] Commerce again found in <u>Remand Results III</u> that VIL and VFL should be collapsed. <u>Remand Results III</u>, at 5. That decision has not been challenged by any of the parties. Accordingly, for the remainder of this opinion, we treat VIL and VFL as one entity.

DISCUSSION

In reviewing judgments from the Court of International Trade in antidumping proceedings, this court reapplies the "substantial evidence" standard prescribed at 19 U.S.C. § 1516a(b)(1)(B)(i) to the underlying Commerce decision. Atl. Sugar, Ltd. v. United States, 744 F.2d 1556, 1559 n.10 (Fed. Cir. 1984). This court must reverse a determination that is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). Our responsibility is to ascertain whether Commerce's decision is supported by substantial evidence on the "record as a whole, including that which 'fairly detracts from its weight.'" Nippon Steel Corp. v. United States, 458 F.3d 1345, 1351 (Fed. Cir. 2006) (citations omitted).

I

In this case, we agree with Commerce that it did not have a prior practice of collapsing the Viraj Group that would dictate the result in the present case. Both parties admit that there was no explicit determination in either the new shipper or the '98-'99 reviews to collapse the Viraj Group. Commerce's actions in the '98-'99 review appear consistent with collapsing the Viraj Group, and, contrary to Slater's urging, we find no inference can be drawn from its application of the major input rule in the new shipper review. The new shipper review took place prior to this court's decision in AK Steel Corp. v. United States, where Commerce changed its practice toward affiliated companies. 226 F.3d 1361 (Fed. Cir. 2000). In AK Steel, this court affirmed Commerce's decision to no longer apply the major input rule once it had determined to collapse affiliated companies. Id. at 1376. Because the new shipper review occurred prior to AK Steel, we find it unreasonable to infer, based on Commerce's decision to

apply the major input rule in that review, that it had determined not to collapse the Viraj Group. Accordingly, there is no inconsistency between Commerce's prior practices and its determination in this case that the Viraj Group should be collapsed.

II

The Viraj Group next argues that the decision not to collapse the Viraj Group under Commerce's collapsing regulation, as properly interpreted, is not supported by substantial evidence. According to its regulation, Commerce collapses companies that satisfy a three-part test: (1) the companies must be affiliated pursuant to 19 U.S.C. § 1677(33), (2) the companies must have "production facilities for similar or identical products that would not require substantial retooling of either facility in order to restructure manufacturing priorities," and (3) there must be "significant potential for the manipulation of price or production." 19 C.F.R. § 351.401(f)(1).

The parties only dispute whether the second prong of Commerce's three-part collapsing test is satisfied. Central to this analysis is the proper interpretation of the collapsing regulation, as Commerce and the Court of International Trade apply different interpretations to three aspects of the second prong.

When reviewing Court of International Trade decisions, we review <u>de novo</u> the proper interpretation of the governing statutes and regulations. <u>Guess?, Inc. v. United States</u>, 944 F.2d 855, 857 (Fed. Cir. 1991). If a regulation is clear on its face, no deference is given to the promulgating agency's interpretation, as we interpret the regulation in accordance with its clear meaning. <u>Christensen v. Harris County</u>, 529 U.S. 576, 588 (2000). Where a regulation is ambiguous, however, we give the promulgating agency's interpretation substantial deference "as long as . . . the agency's interpretation

is neither plainly erroneous nor inconsistent with the regulation." Gose v. U.S. Postal Serv., 451 F.3d 831, 836 (Fed. Cir. 2006). In this context, "[d]eference to an agency's interpretation of its own regulations is broader than deference to the agency's construction of a statute, because in the latter case the agency is addressing Congress's intentions, while in the former it is addressing its own." Cathedral Candle Co. v. U.S. Int'l Trade Comm'n, 400 F.3d 1352, 1363-64 (Fed. Cir. 2005).

A

The first interpretive inquiry is whether the word "either" in the collapsing regulation requires that all of the facilities be able to restructure without substantial retooling, or whether the test is satisfied if any one of the facilities can. The Court of International Trade stated that the regulation "appears to require that Commerce examine the production facilities of both (or all) companies and evaluate the possibility that production may be shifted from one company to another and vice versa." Slater II, 316 F. Supp. 2d at 1375. Commerce, on the other hand, does not believe that its regulation requires the possibility of shifting production among companies in either direction, but rather, that it is appropriate to collapse if any one company could shift production to that of the other, without substantially retooling. Remand Results II, at 9-21. Commerce and the Court of International Trade cite competing dictionary definitions of the word "either" as supporting their respective positions.[3] After review of the parties' positions, both seem reasonable and we conclude that the regulation is ambiguous on its face. See Gose, 451 F.3d at 836.

---

[3] One definition of "either" is "each of two." Slater II, 316 F. Supp. 2d at 1375 (citing 5 Oxford English Dictionary 102 (2d ed. 1989)). An alternative definition, listed by other dictionaries as the primary definition, is "one or the other of the two." Id.

2006-1158                                    11

We cannot conclude that Commerce's definition is plainly erroneous. Moreover, Commerce's definition appears to be consistent with the purpose of the regulation. It allows Commerce to collapse companies where manipulation could occur between affiliated companies in any one direction. Because an important goal of the regulation is to prevent such manipulation, Queen's Flowers de Columbia v. United States, 981 F. Supp. 617, 628 (Ct. Int'l Trade 1997), we find that Commerce's interpretation is consistent with that goal. Accordingly, we hold that where any one of two related companies could shift production to that of the other without necessitating substantial retooling, this part of Commerce's collapsing regulation is satisfied.

B

Next, the Court of International Trade disagreed with Commerce's interpretation of its regulation as focused "on whether the production facilities of the producers in question do (or can) produce similar or identical merchandise, not on whether the production facilities themselves are similar or identical." Remand Results II, at 9. The Court of International Trade's interpretation of the collapsing regulation places the emphasis on the production facilities, while Commerce's interpretation focuses on the products produced. The Court of International Trade stated that "Commerce must specifically address the question that the companies' production facilities for similar products would not require 'substantial retooling.'" Slater II, 316 F. Supp. 2d at 1377-78 (emphasis added).

Here, the regulation is clear on its face. The regulation on its face requires similarity in the products produced, not in the facilities that produce them. 19 C.F.R. § 351.401(f). According to the clear language of the regulation, so long as the products

are similar or identical, different processes using different equipment could make them. The facilities are relevant only to the examination of whether "substantial retooling" would be necessary for the producers "in order to restructure manufacturing priorities." Id.

C

The final dispute regarding Commerce's application of its collapsing regulation involves whether Commerce should apply the major input rule when determining whether or not to collapse related entities. The major input rule, codified at 19 U.S.C. § 1677b(f)(3), provides Commerce discretion in valuing one company's production input, when the company receives that input from an affiliated company at a price less than the cost of production for the input. Similarly, the fair value rule is codified at 19 U.S.C. § 1677b(f)(2). The fair value rule allows Commerce to disregard certain transactions between affiliated companies and to value costs in the transaction based on fair market value, as though the transaction occurred between unaffiliated companies.

During the present review, the Court of International Trade urged that "Commerce must explain why it finds it unnecessary to address the relative merits of collapsing and the major input rule as they relate to the facts of this case." Slater II, 316 F. Supp. 2d at 1380. The Court of International Trade stated in Slater II, and Slater argued to this court, that because VIL/VFL purchases an important, material input from its affiliate VAL, application of the major input rule would accentuate "potential misstatements" in costs that would arise if Viraj Group was treated as one entity. Id. at 1381.

Commerce, on the other hand, explained that "unless and until [it] makes the determination not to collapse these companies, we find that it is inappropriate to analyze the facts of this case under the major input rule." Remand Results II, at 39. It is Commerce's practice to either collapse affiliated companies or apply the major input rule to the concerned companies, but not both. Commerce explained that it makes a collapsing determination early in an antidumping proceeding, thereby allowing collapsed entities to provide one set of information on its costs and sales. If the entities are not collapsed, Commerce then evaluates the transactions between the companies and determines whether to value inputs at cost, transfer price, or market value. The Court of International Trade's position would add a fourth component to the collapsing analysis, requiring Commerce to also consider whether a higher antidumping duty could be imposed if the companies were not treated as one. As Commerce explained, it would be inappropriate "margin shopping" that could "impose a tremendous and potentially unnecessary burden on the respondent and [Commerce]" if it were to consider the fair value and major input rules prior to determining whether or not to collapse. Remand Results II, at 17.

Although this dispute involves Commerce's interpretation of its collapsing regulation, it appears more precisely to implicate whether Commerce is acting appropriately in carrying out the statute establishing the major input rule, 19 U.S.C. § 1677b(f)(3). Accordingly, we review Commerce's actions under the framework provided in Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984). In Chevron, the Supreme Court stated:

> If Congress has explicitly left a gap [in a statute] for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific

provision of the statute by regulation. Such legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute. Sometimes the legislative delegation to an agency on a particular question is implicit rather than explicit. In such a case, a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency.

Id. at 844.

We conclude that Congress made a "delegation on this issue to the agency." Id. Specifically, the major input statute states that Commerce "may determine the value of the major input" if certain prerequisite conditions are met. 19 U.S.C. § 1677b(f)(3) (emphasis added). This creates a gap as to when the rule should be applied if the prerequisite conditions are met, and this court has concluded that Congress implicitly intended for Commerce to create its own rules for implementing when to apply the major input rule. AK Steel, 226 F.3d at 1376 ("[T]he statute leaves possible application of the fair-value and major-input provisions to the discretion of the agency.").

Next, we consider whether Commerce's practice in implementing the major input rule is reasonable. Chevron, 467 U.S. at 844. It should be noted that our decision is not dictated by AK Steel. There, this court approved Commerce's practice of not applying the major input rule once it has properly determined that companies should be collapsed. AK Steel, 226 F.3d at 1376. Here, we are considering Commerce's practice of not applying the major input rule when deciding whether or not to collapse affiliated entities. Our conclusion, however, is the same. We find that the approach suggested by the Court of International Trade is inappropriately results-oriented and would create a tremendous burden on Commerce that is not required or suggested by the statute. Commerce's practice, to either treat affiliated companies as one or to consider transactions among the companies under the fair value and major input rules, is

reasonable. Accordingly, we reverse the decision of the Court of International Trade to the extent that Commerce was required to apply the major input rule when analyzing whether to collapse affiliated entities under 19 C.F.R. § 351.401(f).

III

Given the proper interpretation of the collapsing regulation, the inquiry becomes whether substantial evidence in the record supports the decision to collapse the Viraj Group.[4] See Nippon Steel Corp., 458 F.3d at 1351. We find that it does.

VAL has production facilities to melt steel and cast billets, and to transform billets into black bar. This includes equipment for cutting and heating, as well as a flat and bar mill. VIL and VFL have production facilities to transform black bar into bright bar. This includes equipment for cutting, heating, annealing and pickling, and cold-forming. In order for VAL to make a product identical to that produced by VIL/VFL (i.e., bright bar), it would need to add annealing and pickling, and cold-forming equipment. Remand Results II, at 11-12.

Commerce calculated that this retooling would require 2.88%[5] of VAL's production-related assets. Commerce determined this was not "substantial" based on the following evidence. Although VAL reported losses during the '00-'01 POR, it

---

[4]    Commerce has consistently maintained that the Viraj Group should be collapsed. Remand Results III, at 8; Remand Results II, at 39; Remand Results I, at 14; 67 Fed. Reg. 45,956 (Dep't of Commerce July 11, 2002). While the Court of International Trade's decision in Slater IV is the decision that has been directly appealed, the proper inquiry is whether the Court of International Trade's order in Slater III was correct.

[5]    Commerce arrived at this number using VAL's production machinery assets as the denominator (335,937,034 Rupees) with VIL's total production related assets value (9,663,584 Rupees) as the numerator.

increased its production-related assets during the year by 5,582,079 Rupees (approximately two-thirds the investment needed to produce bright bar). In addition, during the '00-'01 POR, VAL reported 1,635,750,466 Rupees in sales, and it received 883,280,559 Rupees in loans (more than ninety times the investment needed to produce bright bar). Id. at 33-36.

The evidence of record supports Commerce's conclusion that the retooling that VAL would need to undertake to produce bright bar would not be "substantial."[6] The record establishes that VAL and VIL/VFL have "production facilities for similar or identical products that would not require substantial retooling of either facility in order to restructure manufacturing priorities." 19 C.F.R. § 351.401(f). Accordingly, the Viraj Group companies meet each of the three parts of Commerce's collapsing regulation, and collapsing the Viraj Group for purposes of calculating a single antidumping duty is therefore appropriate.

CONCLUSION

We hold that the Court of International Trade erred in finding that Commerce had a prior practice that dictated not collapsing VAL with VIL/VFL when calculating an appropriate antidumping duty. Moreover, the decision to collapse the Viraj Group is supported by substantial evidence when analyzing the companies under Commerce's properly interpreted collapsing regulation. Accordingly, we reverse the Court of International Trade's decisions in Slater III and Slater IV, set aside Commerce's

---

[6] Commerce also noted that it took VFL less than one year to commission, install, and expense its new forging production equipment, which is more complex than the finishing equipment in the retooling at issue. Remand Results II, at 37-38. Thus, to the extent that time for retooling should be a consideration, this too seems to establish that the retooling would not be substantial.

dumping margin calculation in <u>Remand Results III</u>, and direct the Court of International Trade to reinstate Commerce's determination in <u>Remand Results II</u>.

<u>REVERSED and REMANDED</u>