# United States Court of Appeals
# for the Federal Circuit

———————————

**TARGET CORPORATION, QINGDAO KINGKING APPLIED CHEMISTRY CO., LTD., DALIAN TALENT GIFT CO., LTD., SHANGHAI AUTUMN LIGHT ENTERPRISE CO., LTD., ZHONGSHAN ZHONGNAM CANDLE MANUFACTURER CO., LTD., AMSTAR BUSINESS CO., LTD., JIAXING MOONLIGHT CANDLE ART CO., LTD., AND SHONFELD'S (USA), INC.,**
*Plaintiffs,*

**and**

**NANTUCKET DISTRIBUTING CO., INC.,**
*Plaintiff-Appellant,*

**and**

**SPECIALTY MERCHANDISE CORPORATION,**
*Plaintiff-Appellant,*

**v.**

**UNITED STATES,**
*Defendant-Appellee,*

**and**

**NATIONAL CANDLE ASSOCIATION,**
*Defendant-Appellee.*

———————————

2009-1518, -1519

———————————

Appeal from the United States Court of International Trade in consolidated case No. 06-00383, Judge Leo M. Gordon.

————————————

Decided:  June 21, 2010

————————————

NED H. MARSHAK, Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP, of New York, New York, argued for all plaintiffs-appellants.  With him on the brief for Nantucket Distributing Co. Inc. were MAX F. SCHUTZMAN and ANDREW T. SCHUTZ.   Counsel for plaintiff-appellant Specialty Merchandise Corporation were JEFFREY S. NEELEY, STEPHEN W. BROPHY and MATTHEW T. MCGRATH, Barnes, Richardson & Colburn, of Washington, DC.

MICHAEL J. DIERBERG, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellee United States.  With him on the brief were TONY WEST, Assistant Attorney General, JEANNE E. DAVIDSON, Director, and FRANKLIN E. WHITE, JR., Assistant Director. Of counsel was ANTONIA R. SOARES, Trial Attorney.

KAREN A. MCGEE, Barnes & Thornburg LLP, of Washington, DC, argued for defendant-appellee National Candle Association.  With her on the brief was RANDOLPH J. STAYIN.

————————————

Before RADER, *Chief Judge*, [*] GAJARSA, and PROST, *Circuit Judges*.

GAJARSA, *Circuit Judge*.

This case comes to us on appeal from the Court of International Trade. At issue is whether the Court of International Trade correctly sustained the U.S. Department of Commerce's ("Commerce") final affirmative circumvention determination that petroleum wax candles with 50% or more vegetable wax ("mixed-wax candles") are later-developed merchandise covered by the antidumping duty order on petroleum wax candles from China. *Target Corp. v. United States*, 626 F. Supp. 2d 1285 (Ct. Int'l Trade 2009) ("*Target II*"). Because Commerce's reasonable interpretation of the relevant Congressional statute is entitled to *Chevron* deference and because Commerce's determination rested on substantial evidence, we affirm.

## BACKGROUND

### I.

Importers of goods into the United States are subject to antidumping duties under Section 736(a) of the Tariff Act of 1930 if (1) Commerce finds that "a class or kind of foreign merchandise is being, or is likely to be, sold in the United States at less than fair value [("LTFV")];" and (2) the U.S. International Trade Commission ("ITC") finds that a domestic industry is materially injured (or is threatened with material injury) or the establishment of an industry in the United States is materially retarded "by reason of imports of *that* merchandise, or by reason of sales (or the likelihood of sales) of that merchandise for importation." 19 U.S.C § 1673 (emphasis added); *see also*

---

[*]   Randall R. Rader assumed the position of Chief Judge on June 1, 2010.

*Viraj Group v. United States*, 476 F.3d 1349, 1351 (Fed. Cir. 2007).

To combat circumvention of antidumping orders, "Congress has provided that Commerce's consideration of certain types of articles within the scope of an [antidumping duty] order will be a proper clarification or interpretation of the order instead of improper expansion or change even where these products do not fall within the order's literal scope." *Wheatland Tube Co. v. United States*, 161 F.3d 1365, 1370 (Fed. Cir. 1998). These articles include: (1) merchandise completed or assembled in the United States whose "parts or components [are] produced in the foreign country with respect to which [an antidumping duty] order . . . applies," 19 U.S.C. § 1677j(a); (2) merchandise "completed or assembled in another foreign country from merchandise which . . . is subject to [an antidumping duty] order or . . . is produced in the foreign country with respect to which [the] order . . . applies," *id.* § 1677j(b); (3) merchandise "altered in form or appearance in minor respects . . . whether or not included in the same tariff classification," *id.* § 1677j(c); and (4) later-developed merchandise that would have been included in the order, *see id.* § 1677j(d).

This case involves the last category of those articles, "later-developed" merchandise, which is governed by 19 U.S.C. § 1677j(d). Section 1677j(d) codifies Commerce's administrative practice for analyzing whether later-developed merchandise falls within the scope of an antidumping duty order. *See* H.R. Rep. No. 100-576, at 601 (1988), reprinted in 1988 U.S.C.C.A.N. 1547, 1634 ("This provision is intended to clarify and codify current Commerce Department authority, which has been recognized by the courts.").

## II.

In 1986, Commerce issued an antidumping duty order on petroleum wax candles from China. *Petroleum Wax Candles from the People's Republic of China*, 51 Fed. Reg. 30,686 (Aug. 28, 1986) ("*Candles Antidumping Order*"). In the LTFV proceeding, Commerce defined the subject merchandise, in relevant part, as "petroleum wax candles made from petroleum wax." *Petroleum Wax Candles from the People's Republic of China*, 51 Fed. Reg. 25,085 (Jul. 10, 1986). For the corresponding injury investigation, the ITC defined the domestic like product, in relevant part, as candles "composed of over 50 percent petroleum wax." *Candles from the People's Republic of China*, USITC Pub. 1888, Inv. No. 731-TA-282, at 2-3 (Aug. 1986) ("*ITC Final Report*").

Commerce, in a series of scope determinations, recognized that the ITC's percentage-based like product definition mandated that candles containing less than 50% petroleum wax be excluded from the scope of the *Candles Antidumping Order*. *See, e.g.*, *Petroleum Wax Candles from the People's Republic of China*, Final Scope Ruling, A-570-504 (Dec. 10, 1998) ("*Costco Wholesale*") (candles composed of 19% petroleum wax and 81% beeswax excluded from the *Candles Antidumping Order* for not satisfying Commission's like product definition of petroleum wax candles).

In 2004, the domestic interested party, the National Candle Association ("NCA"), petitioned Commerce to initiate a later-developed merchandise anticircumvention inquiry and determine whether petroleum candles "containing palm or vegetable wax as the majority ingredient" were circumventing the *Candles Antidumping Order*. NCA claimed that the late-1990s development of mixed-wax candles, which allegedly were indistinguishable by

the consumer from petroleum wax candles, enabled importers to completely avoid paying antidumping duties on 87% of their candles imported from China. In March 2005, Commerce initiated the inquiry. *Petroleum Wax Candles from the People's Republic of China*, 70 Fed. Reg. 10,962, 10,963 (Mar. 7, 2005) ("*Notice of Initiation*").

As Commerce was commencing the later-developed merchandise anticircumvention inquiry, the ITC was coincidentally conducting a second five-year sunset review of the *Candles Antidumping Order*. *See Candles from the People's Republic of China*, USITC Pub. 3790, Inv. No. 731-TA-282 (July 2005) ("*Second Sunset Review*"). The lone participant in the *Second Sunset Review*, NCA, urged the ITC to re-examine the domestic like product definition from the *ITC Final Report* and include "all blended candles" regardless of the proportion of petroleum wax. *Second Sunset Review* at 7. The ITC then redefined the domestic like product "to include all blended candles," or more simply, candles "containing any amount of petroleum wax." *Id.* at 9. No party challenged the *Second Sunset Review*.

Subsequently, Commerce completed the anticircumvention inquiry and determined that mixed-wax candles containing "any amount" of petroleum wax were within the scope of the *Candles Antidumping Order*. *Petroleum Wax Candles from the People's Republic of China*, 71 Fed. Reg. 59,075, 59,077-78 (Oct. 6, 2006) ("*Final Determination*").

Specifically, Commerce ruled that it was appropriate to apply a "commercial availability" test for determining whether merchandise is "later-developed" within the meaning of 19 U.S.C. § 1677j(d). Furthermore, Commerce proposed an additional requirement that later-developed merchandise must have resulted from a significant tech-

nological advancement or significant alteration to an earlier product. In addition, Commerce found that it could not "definitively conclude" that mixed-wax candles were commercially available at the time of the investigation. Commerce also determined that mixed-wax candles should be within the scope of the antidumping order, based upon its findings that petroleum and mixed-wax candles are similar when applying the *Diversified Products* criteria set forth in 19 U.S.C. § 1677j(d)(1)[1], including the general physical characteristics, the expectations of the ultimate purchasers, the ultimate use of the products, the channels of trade of the products, and the advertising and display of the products.

Plaintiffs[2], including Appellants Nantucket Distributing Co., Inc. and Specialty Merchandise Corporation, Inc. (collectively, "Nantucket"), challenged Commerce's determination. The Court of International Trade affirmed in part and remanded in part Commerce's determination. *Target Corp. v. United States*, 578 F. Supp. 2d 1369 (Ct. Int'l Trade 2008) ("*Target I*").

The Court of International Trade found that Commerce's commercial availability test was based upon a

---

[1] These criteria are commonly referred to as the *Diversified Products* criteria, as they derive from the Court of International Trade's decision in *Diversified Products Corp. v. United States*, 572 F. Supp. 883, 889 (Ct. Int'l Trade 1983).

[2] Plaintiffs in the original petition were Target Corporation, Qingdao Kingking Applied Chemistry Co., Ltd., Dalian Talent Gift Co., Ltd., Shanghai Autumn Light Enterprise Co., Ltd., Zhongshan Zhongnam Candle Manufacturer Co., Ltd., Amstar Business Co., Ltd., Jianxing Moonlight Candle Art Co., Ltd., Specialty Merchandise Corporation and Shonfeld's (USA), Inc., Nantucket Distributing Co., Inc., and Specialty Merchandise Corporation.

reasonable interpretation of the statute. *Id.* at 1375. The Court of International Trade, however, remanded the case to Commerce with respect to two issues. First, the court concluded that language in Commerce's final anticircumvention determination, that it could not "definitively conclude" that mixed-wax candles were commercially available at the time of the antidumping investigation, caused confusion which prevented the court from appropriately reviewing Commerce's finding for substantial evidence. *Id.* at 1376. The Court of International Trade directed Commerce to either (a) make a straightforward finding of commercial unavailability or (b) explain how a "definitive conclusiveness" standard is a reasonable interpretation of the statute. *Id.* Second, the Court of International Trade found that Commerce's requirement that later-developed merchandise in every instance must entail a significant alteration or significant technological advance of subject merchandise was not in accordance with the statute, and the court ordered Commerce to reconsider this aspect of its interpretation of the statute. *Id.* at 1376-78.

Upon remand, Commerce made a straightforward finding of commercial unavailability at the time of the antidumping investigation based upon record evidence. *See Final Results Pursuant to Court Remand* (Nov. 10, 2008) ("*Second Remand Determination*"). Commerce also found that later-developed merchandise does not in every instance entail a significant alteration or technological advance of the subject merchandise. Instead, Commerce found that an evolution of wax-mixing technology in the 1990s facilitated the appearance in the market of mixed-wax candles in 1999 at the earliest, well after the antidumping investigation.

The Court of International Trade sustained Commerce's determination of commercial unavailability at the

time of the antidumping investigation. *Target II*, 626 F. Supp. 2d at 1287. The court also held that substantial evidence supported Commerce's determination, unchallenged in Nantucket's appeal to this court, that mixed-wax candles constitute the same class or kind of merchandise based upon consideration of the *Diversified Products* criteria. *Id.* at 1295-1300.

Nantucket now appeals the Court of International Trade's decision to this court. This court has jurisdiction to review the Court of International Trade's final decision under 28 U.S.C. § 1295(a)(5).

## DISCUSSION

In reviewing judgments from the Court of International Trade in antidumping proceedings, this court reapplies the "substantial evidence" standard prescribed at 19 U.S.C. § 1516a(b)(1)(B)(i) to the underlying Commerce decision. *Atl. Sugar, Ltd. v. United States*, 744 F. 2d 1556, 1559 n.10 (Fed. Cir. 1984); *see also Tung Mung Dev. Co. v. United States*, 354 F.3d 1371, 1378 (Fed. Cir. 2004). Commerce's determination should be sustained unless it is "'unsupported by substantial evidence on the record, or otherwise not in accordance with law.'" *Corus Staal BV v. Dep't of Commerce*, 395 F.3d 1343, 1346 (Fed. Cir. 2005) (*quoting* 19 U.S.C. § 1516a(b)(1)(B)(i)). We affirm Commerce's determination if it is supported by substantial evidence on the "record as a whole, including that which 'fairly detracts from its weight.'" *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1351 (Fed. Cir. 2006).

## I.

A critical legal issue in this case is whether mixed-wax candles are "later-developed merchandise." The

parties debate what "later-developed" means as used in the anticircumvention statute.

Before Commerce and the trial court, Nantucket contended that the plain meaning of "later-developed" merchandise is merchandise that did not "exist" at the time of an antidumping investigation. On appeal, Nantucket continues to primarily define "later-developed" in terms of existence, but also suggests a slightly different "actually useable or available" test. Nantucket alleges that because mixed-wax candles existed at the time of the initiation of the investigation, they cannot be considered "later-developed" merchandise.

By contrast, Commerce derived a commercial availability standard for the term "later-developed" from its prior administrative precedents.[3] Based on these prior precedents, Commerce defined commercial availability as covering products either present in the commercial market or fully developed, i.e., tested and ready for commercial production, but not yet in the commercial market.

Judicial review of Commerce's statutory interpretation is governed by the two-step framework set forth in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-45 (1984). *See DuPont Teijin Films USA, LP v. United States*, 407 F.3d 1211 (Fed. Cir.

---

[3] For example, in each of *Portable Electronic Typewriters from Japan*, 55 Fed. Reg. 47,358 (Nov. 13, 1990) (final scope ruling), *Electrolytic Manganese Dioxide from Japan*, 57 Fed. Reg. 395 (Jan. 6, 1992) (final scope ruling), and *Erasable Programmable Read Only Memories from Japan*, 57 Fed. Reg. 11,599 (Apr. 6, 1992) (final scope ruling), Commerce addressed the commercial availability of the later-developed merchandise in some capacity, such as the product's presence in the commercial market or whether the product was fully developed, i.e., tested and ready for commercial production.

2005).  Pursuant to *Chevron*, a court must first determine whether Congress' intent is clear.  If it is not, the court must uphold the agency's interpretation if it is reasonable.  *DuPont Teijin Films*, 407 F.3d at 1215.

Here, the language of the anticircumvention statute does not define what constitutes later-developed merchandise.  Section 1677j(d)(1) provides that in determining "whether merchandise *developed after* an [antidumping] investigation is initiated" is within the scope of an outstanding antidumping duty order, Commerce shall consider the *Diversified Products* factors.  19 U.S.C. § 1677j(d)(1) (emphasis added).  The statute's reference to "later-developed merchandise" as merchandise "developed after" an antidumping investigation does not compel a particular meaning of "later-developed."  Nor do Commerce's regulations governing anticircumvention proceedings expressly define what constitutes "later-developed" merchandise.  *See* 19 C.F.R. § 351.225(j) (referring back to the criteria enumerated in § 1677j(d) of the statute).

Noting that the word "developed" has many meanings and that it is "not a matter of giving effect to one, clear, Congressional intent (*Chevron* step one)," the Court of International Trade properly proceeded to review the reasonableness of Commerce's interpretation pursuant to step two of *Chevron*.  *Target I*, 578 F. Supp. 2d at 1375-1376.  To determine whether Commerce's interpretation is reasonable, the court may look to "the express terms of the provisions at issue, the objective of those provisions, and the objectives of the antidumping scheme as a whole." *See Wheatland Tube*, 495 F.3d at 1361 (citation omitted).

The Court of International Trade properly found that Commerce's interpretation was reasonable for several reasons.  First, the commercial availability test was

consistent with (although not necessarily compelled by) the definition of "developed" provided in the dictionary. *Target I*, 578 F. Supp. 2d at 1375 (citing the American Heritage Dictionary of the English Language (Houghton Mifflin Company 4th ed. 2004)). Second, the commercial availability of the product at issue is relevant because a "product's actual presence in the market at the time of the [antidumping] investigation is a necessary predicate of its inclusion or exclusion from the scope of an antidumping order." *Id.* (citing with approval Commerce's explanation for including commercial availability standard as part of its analysis); *see Issues and Decision Memorandum for the Later-Developed Merchandise Anticircumvention Inquiry of the Antidumping Duty Order on Petroleum Wax Candles from the People's Republic of China*, A-570-504, at 23 (Sept. 29, 2006) ("*Decision Memorandum*"). Third, the later-developed merchandise provision is designed to prevent circumvention of an antidumping order by a comparable product (as determined by the *Diversified Products* analysis) to the subject merchandise. Commerce's interpretation accomplishes this objective since it reaches comparable products that emerge in the market after imposition of the antidumping order. *Target I*, 578 F. Supp. 2d at 1375-76.

In sum, because the anticircumvention statute is ambiguous, this court defers to Commerce's reasonable interpretation of "later-developed" as turning upon whether the merchandise was commercially available at the time of the antidumping investigation. *See DuPont Teijin Films*, 407 F.3d at 1215 (holding that where Congressional intent is not clear, Commerce's interpretation must be upheld so long as it is reasonable, even if it is "not the only or even preferred reasonable interpretation").

II.

Nantucket also challenges the Court of International Trade's finding that substantial evidence supports Commerce's determination that mixed-wax candles were not commercially available in the market at the time of the original investigation. *See Target II*, 626 F. Supp. 2d at 1298. As discussed below, the Court of International Trade properly weighed the voluminous evidence submitted by NCA against the documents that plaintiffs relied on as purportedly showing mixed-wax candles were commercially available. *Id.* at 1290-91.

NCA has submitted evidence that mixed-wax candles were not commercially available at the time of the antidumping investigation, including hundreds of pages of brochures, price lists, and marketing materials dating back to 1986, in which none of the companies identified offered mixed-wax candles at the time of the investigation; a comprehensive advertising survey of over 2,200 product catalogues from 1985 to 2004 demonstrating that mixed-wax candles were not available in 1985 or 1986; affidavits and testimony of long-standing industry members, stating that at the time of the investigation in 1985-86, they were not producing mixed-wax candles and mixed-wax candles were not commercially available; independent marketing studies showing that mixed-wax candles did not appear in the market until the early 2000s; and sales data submitted by NCA members establishing that the earliest a party sold any mixed-wax candle was in 1999.

To support its argument that mixed-wax candles were commercially available at the time of the investigation, Nantucket refers to the *ITC Final Report*, thirty or so pre-investigation patents, a 1906 Lamborn Manual, a 1921 Will & Baumer product catalogue, a Financial Times

article and a 1961 Union Oil pamphlet. As the Court of International Trade found, Commerce did not ignore this evidence. *Target II*, 626 F. Supp. 2d. at 1291-92. Rather, it weighed all the evidence, considered Nantucket's arguments, and ultimately found that mixed-wax candles were not available in the market at the time of the LTFV investigation. *Id.*

Nantucket argues that the statement in *ITC Final Report* that "specialty candle making operations do have requirements for the more 'exotic' types of wax, such as hydrogenated vegetable oil or jojoba" purportedly recognized the existence of vegetable waxes. As the Court of International Trade noted, however, the ITC's *Second Sunset Review* indicates that the *ITC Final Report* did not "specifically state whether those candles contained 100 percent vegetable wax or some combination of waxes." *Second Sunset Review* at 6 n.29. The ITC in the *Second Sunset Review* further clarified that there was no commercial production of mixed-wax candles in 1986 when the ITC made its original determination and that it therefore did not address mixed-wax candles in its original LTFV report. *Second Sunset Review* at 7. Thus, the clarification issued by the ITC as part of its *Second Sunset Review* analysis is corroborative evidence that mixed-wax candles were not available at the time of the LTFV investigation.

With respect to the Lamborn Manual and the Will & Baumer product catalogue, Commerce noted that neither references mixed-wax candles. Instead they either refer to candles containing stearic acid, which is not a vegetable-based wax, or they refer to composite candles but do not indicate what these composite candles contain. *Decision Memorandum* at 24-25. Similarly, the article from the Financial Times discusses vegetable oil, not wax. *Decision Memorandum* at 24-25.

Nantucket also referred to a 1961 Union Oil pamphlet, which noted that the most common types of wax used in making candles were "paraffin, stearic acid (also known as Stearin), beeswax, cerasin, carnauba and candelilla waxes." Questioning the relevance of that reference, NCA asserts that "Stearic acid, carnauba and Japanese wax are not vegetable waxes, and adding them to petroleum wax does not make a mixed-wax candle." But NCA has not cited to any authority to support its contention that carnauba is not a wax. The same Union Oil pamphlet, however, noted that "[w]hen used, the proportions of [Ceresin, carnauba and candelilla waxes] usually vary from 1% to 5%." Since only mixed-wax candles composed of petroleum wax combined with 50% or more vegetable wax were the subject of Commerce's anticircumvention inquiry, the reference to the use of carnauba does not constitute substantial evidence regarding the commercial availability of mixed-wax candles that were the subject of Commerce's inquiry.

Furthermore, the Court of International Trade noted that Commerce did not ignore the pre-investigation patents, which Nantucket also relies upon in this appeal. *Target II*, 626 F. Supp. 2d at 1292-93. The Court of International Trade held that Commerce reasonably found this evidence unpersuasive on the ground that most of the thirty or so pre-investigation patents are not addressed to candle wax. *Id.* at 1293. Some of the patents concern novel wicks and wick systems that may be used with any conventional candle. Others involve novel decorative features, most of which are simply applied to an existing conventional candle, or incorporated into a conventional wax, and yet others relate to candle body production techniques or preparation methods using conventional waxes. *Id.* Moreover, there was no evidence

linking any of these patents with the commercial appearance of mixed-wax candles in the marketplace. *Id.*

By contrast, Commerce noted that it was not until the late 1990s that a series of patented technological advancements in wax technology resulted in a mixed wax that could actually be used to produce the candles that were the subject of Commerce's inquiry. More importantly, Commerce noted that direct evidence linked these post-investigation patents with the appearance of mixed-wax candles in the marketplace in the late 1990s. This evidence consists of press releases issued by a large wax producer, Cargill, publicizing its acquisition of the rights to the technology enabling the production of mixed-wax candles from wax compositions developed by Dr. Bernard Tao; a multi-million dollar lawsuit filed on October 10, 2003 by Candle Corporation of America over the right to the new technology in the Tao patents; and affidavits by U.S. candle producers describing the production of mixed-wax candles and referencing specific patents filed after the investigation. *See Second Sunset Review* at 34-36. As Commerce properly found, the timing of these new patents and their link to the appearance of mixed-wax candles in the marketplace are both persuasive.

Therefore, given the extensive evidence that Commerce cited in its determination that mixed-wax candles were not commercially available in the market at the time of the LTFV investigation, we affirm Commerce's determination because it is supported by substantial evidence under 19 U.S.C. § 1516a(b)(1)(B)(i).

III.

A.

Nantucket also argues that even if Commerce was correct that mixed-wax candles constitute later-developed

merchandise, Commerce is not permitted to find that mixed-wax candles are within the scope of the *Candles Antidumping Order* because such an anticircumvention inquiry is contrary to this court's precedents and the prior mixed-wax candle scope rulings. Alternatively, Nantucket contends that mixed-wax candles cannot be included within the *Candles Antidumping Order* because they were intentionally and expressly excluded from the *Candles Antidumping Order* at the time of the antidumping investigation. Both arguments are unavailing.

Contrary to Nantucket's first argument, this court's precedents do not preclude Commerce from finding that mixed-wax candles should be within the scope of the antidumping order as later-developed merchandise; nor was Commerce precluded by its earlier conventional scope rulings that had previously found mixed-wax candles not within the scope of the antidumping order.

Relying primarily on *Wheatland Tube*, Nantucket appears to contend that Commerce may not find merchandise within the scope of an antidumping order based upon circumvention unless the scope of an antidumping order is ambiguous. This court, however, expressly rejected this argument in *Wheatland Tube*. The court recognized that merchandise that might otherwise fall *outside the literal scope of the order* may be included within the scope pursuant to the minor alterations provision. *See Wheatland Tube*, 161 F.3d at 1371 (analogizing to patent cases in which "[a]n accused product *outside the literal language* of a patent claim nevertheless infringes . . . .") (citations omitted, emphasis added). This court further made clear in *Nippon* that the broad language from *Wheatland Tube* "must be interpreted in light of the issue before the court." *Nippon*, 219 F.3d at 1356. In particular, the statement in *Wheatland Tube*, that the minor alteration provision "does not . . . apply to products unequivocally excluded

from the order in the first place," was made "in determining the propriety of Commerce's conducting a scope rather than a minor alternations inquiry." *Nippon*, 219 F.3d at 1356 (internal quotation marks omitted).

Likewise, Nantucket's reliance on cases addressing conventional scope inquiries, such as *Smith Corona Corp. v. United States*, 915 F.2d 683, 685 (Fed. Cir. 1990) and *Floral Trade Council v. United States*, 717 F. Supp. 1580 (Ct. Int'l Trade 1989), is misplaced. Conventional scope inquiries are different from anticircumvention inquiries because they are separate proceedings and address separate issues. *See Target I*, 578 F. Supp. 2d at 1379-80; *compare also* 19 C.F.R. § 351.225(j) (later-developed merchandise) with 19 C.F.R. § 351.225(k) (describing procedures for scope determinations other than anticircumvention inquiries under paragraphs (g) through (j) of § 351.225). Although Commerce recognized that it previously made scope rulings finding certain mixed-wax candles outside the antidumping order's scope, it did so using an analysis guided by section 351.225(k)(1), rather than 19 U.S.C. § 1677j(d). *See Target I*, 578 F. Supp. 2d at 1379-80.

## B.

To the extent that Nantucket contends in the alternative that mixed-wax candles cannot be within the scope of the antidumping order because Commerce intentionally and unequivocally excluded mixed-wax candles from the antidumping order, Nantucket is incorrect.

The kind or class of merchandise encompassed by a final antidumping order is determined by the order. *Smith Corona Corp.*, 915 F.2d at 685. The *Candles Antidumping Order* itself is silent as to mixed-wax candles and does not define petroleum wax candles as having a specific percentage of petroleum wax. Rather, it merely

defines the "subject merchandise" as "certain scented or unscented *petroleum wax candles from petroleum wax* and having fiber or paper-color wicks." *Candles Antidumping Order* at 39,686 (emphasis added). Thus, the *Candles Antidumping Order* did not clearly and unambiguously exclude mixed-wax candles. Indeed, as later-developed merchandise was not present in the market at the time of the LTFV investigation the *Candles Antidumping Order* could not have addressed mixed-wax candles.

Nantucket argues that the ITC originally defined the domestic like product as candles "composed of over 50 percent petroleum wax," which provides evidence of intent to exclude mixed-wax candles from the scope of the *Candles Antidumping Order*. The ITC, however, changed the like product definition during the *Second Sunset Review* to include candles "containing any amount of petroleum wax." *Second Sunset Review* at 9. The ITC clarified that at the time of the injury investigation, mixed-wax candles did not exist in the commercial market. The ITC therefore found that mixed-wax candles were not considered during the investigation. The ITC also specifically found that "during the original investigation, the candles that were not pure petroleum wax were combined with beeswax." *Second Sunset Review* at 6. Given the subsequent clarification in the ITC's *Second Sunset Review*, mixed-wax candles were neither considered nor excluded from the domestic like product by the ITC in the original investigation.

Significantly, as the Court of International Trade noted, "no one challenged the *Second Sunset Review*." *Target I*, 578 F. Supp. 2d at 1381. That decision thus is final and conclusive as well as the domestic like product definition that it contains and the court may not entertain a collateral attack to the *Second Sunset Review* within this proceeding. *See* 19 U.S.C. § 1516a(a)(2)(A) (providing

certain jurisdictional predicates for judicial review in countervailing duty and antidumping duty proceedings). Therefore, as the domestic like product now covers candles "containing any amount of petroleum wax," Commerce's inclusion of mixed-wax candles within the scope of the *Candles Antidumping Order* does not impermissibly expand the scope of the *Candles Antidumping Order* contrary to the domestic like product definition.

## CONCLUSION

Because Commerce's decision that mixed-wax candles are later-developed merchandise covered by the antidumping duty order on petroleum candles from China was supported by substantial evidence and in accordance with law, we affirm the decision of the Court of International Trade.

## AFFIRMED